MARC E. MAYER (SBN 190969)
  mem@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

THERESA B. BOWMAN (*admitted pro hac vice*)
  tbb@msk.com
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, Suite 700
Washington, DC 20036
Telephone: (202) 355-7900
Facsimile: (202) 355-7899

Attorneys for Plaintiff Riot Games, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIOT GAMES, INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>      v.<br><br>SUGA PTE, LTD., a company incorporated under the laws of Singapore; IMBA TECHNOLOGY COMPANY LIMITED, a division of SUGA PTE, LTD., a company incorporated under the laws of Singapore; IMBA NETWORK LLC, a Delaware limited liability company; DOES 1-10, inclusive,<br><br>            Defendants. | CASE NO. 2:22-cv-00429- PA (KS*x*)<br><br>[Assigned to Judge Percy Anderson]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF RIOT GAMES, INC. IN OPPOSITION TO MOTION OF IMBA TECHNOLOGY COMPANY LIMITED AND SUGA PTE, LTD. TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>Date:        July 11, 2022<br>Time:       1:30 pm<br><br>Complaint Filed: January 20, 2022 |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................1

I.   STATEMENT OF FACTS. ..................................................................3

II.  THIS COURT HAS SPECIFIC PERSONAL JURISDICTION
     OVER THE MOVING DEFENDANTS. ...........................................11

     A.  Moving Defendants Purposefully Directed Their Activities
         at the Forum. ...........................................................................13

         1.  Imba Tech "Expressly Aimed" Its Activities At The
             United States..................................................................14

             a.  Imba Tech Directed The Infringing Game To,
                 Marketed To, and Engaged With, U.S.
                 Customers.............................................................14

             b.  Defendants Aimed Their Infringing Conduct
                 At Riot, A U.S. Company Based In California....17

         2.  The Harm to Riot was Foreseeable. ...............................18

     B.  Moving Defendants Also Are Subject To Personal
         Jurisdiction Under Alter Ego Or Agency Theories. .................19

     C.  Riot's Claims Arise out of Defendants' U.S. Activity. ............21

     D.  The Exercise of Jurisdiction is Not Unreasonable. ..................21

         (i)    Extent of Purposeful Interjection ...................................22

         (ii)   Burden of Defending in the Forum .................................22

         (iii)  Extent of Conflict With the Sovereignty of the
                Defendant's State  ..........................................................23

         (iv)   Forum State's Interest in Adjudicating the Dispute.......23

         (v)    Most Efficient Judicial Resolution of the Controversy..23

         (vi)   Importance of the Forum to the Plaintiff's Interest in
                Convenient and Effective Relief .....................................24

1

**TABLE OF CONTENTS**
(continued)

**Page**

(vii)   Existence of an Alternative Forum..................................24

III.   AT MINIMUM, RIOT IS ENTITLED TO JURISDICTIONAL
DISCOVERY.........................................................................................24

CONCLUSION.........................................................................................25

Mitchell
Silberberg &
Knupp LLP

14296541.2

ii

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*3DO Co. v. Poptop Software, Inc.,*
    1998 WL 962202 (N.D. Cal. Oct. 27, 1998) ................................................. 15, 18

*ADO Fin., AG v. McDonnell Douglas Corp.,*
    931 F. Supp. 711 (C.D. Cal. 1996) ........................................................... 11, 19

*AMA Multimedia LLC v. Sagan Ltd.,*
    2016 WL 5946051 (D. Ariz. Oct. 13, 2016) ...................................... 21, 22, 23

*Amini Innovation Corp. v. JS Imports, Inc.,*
    497 F. Supp. 2d 1093 (C.D. Cal. 2007) ............................................................. 17

*Ballard v. Savage,*
    65 F.3d 1495 (9th Cir. 1995) ............................................................................. 21

*Blizzard Entm't, Inc. v. Bossland GmbH,*
    2017 WL 412262 (C.D. Cal. Jan. 25, 2017) ...................................... 2, 12, 18

*Blizzard Entm't, Inc. v. Joyfun Inc. Co., Ltd.,*
    2020 WL 1972284 (C.D. Cal., Feb. 7, 2020) ............................ 2, 12, 13, 15, 17

*Brackett v. Hilton Hotels Corp.,*
    619 F. Supp. 2d 810 (N.D. Cal. 2008) ............................................................. 19

*Burri Law PA v. Skurla,*
    2022 WL 1815827 (9th Cir. June 3, 2022) ............................................. 13, 17

*Calder v. Jones,*
    465 U.S. 783 (1984) .......................................................................................... 13

*California Brewing Co. v. 3 Daughters Brewing LLC,*
    2016 WL 1573399 (E.D. Cal. Apr. 19, 2016) ................................................. 17

*CollegeSource, Inc. v. AcademyOne, Inc.,*
    653 F.3d 1066 (9th Cir. 2011) ......................................................................... 18

*Colt Studio, Inc. v. Badpuppy Enters.,*
    75 F. Supp. 2d 1104 (C.D. Cal. 1999) ............................................................. 16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*CYBERsitter, LLC v. People's Republic of China*,
   805 F. Supp. 2d 958 (C.D. Cal. 2011) ............................................ 13

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
   557 F. 2d 1280 (9th Cir. 1977) ...................................................... 25

*eMag Sols., LLC v. Toda Kogyo Corp.*,
   2006 WL 3783548 (N.D. Cal. Dec. 21, 2006) ................................ 25

*Goes Int'l, AB v. Dodur Ltd.*,
   2015 WL 5043296 (N.D. Cal. Aug. 26, 2015) ......................... 12, 16

*Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames,
   LLC*,
   2021 WL 5861279 (9th Cir. Dec. 10, 2021) .................................. 24

*Halo Creative Design Ltd. v. Comptoir Des Indes Inc.*,
   816 F.3d 1366 (Fed. Cir. 2016) ..................................................... 23

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003) ................................................. 24, 25

*Hydentra HLP Int'l Ltd. v. Sagan Ltd.*,
   783 Fed. Appx. 663 (9th Cir. 2019) ............................................... 19

*Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*,
   880 F. Supp. 743 (C.D. Cal. 1995) ...................................... 16, 22, 23

*Jeske v. Fenmore*,
   2008 WL 5101808 (C.D, Cal. Dec. 1, 2008) .................................. 22

*Lafarge Canada, Inc. v. Bank of China*,
   2000 WL 1457012 (S.D.N.Y. Sept. 29, 2000) ............................... 23

*LiveCareer Ltd v. Su Jia Techs. Ltd.*,
   2015 WL 1448505 (N.D. Cal. Mar. 31, 2015) ............................... 23

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ....................................................... 13

Mitchell
Silberberg &
Knupp LLP

14296541.2

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

3

**Page(s)**

4

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,*
   243 F. Supp. 2d 1073,1087 (C.D. Cal. 2003)................................................16, 19

5

6

*Michael Grecco Prods., Inc. v. Netease, Inc.,*
   2019 WL 3245872 (N.D. Cal. July 3, 2019) ....................................................... 14

7

8

*Mountz v. Northeast Indus. Bolting & Torque, LLC,*
   2016 WL 6699295 (N.D. Cal. Sept. 30, 2016).................................................... 18

9

10

*Orchid Biosciences, Inc. v. St. Louis Univ.,*
   198 F.R.D. 670 (S.D. Cal. 2001)..................................................................24, 25

11

12

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146 (9th Cir. 2007) ............................................................................ 15

13

14

*Quigley v. Guvera IP Pty Ltd.,*
   2010 WL 5300867 (N.D. Cal. Dec. 20, 2010) .................................................... 16

15

16

*RAE Sys., Inc. v. TSA Sys., Ltd.,*
   2005 WL 1513124 (N.D. Cal. June 24, 2005) .................................................... 20

17

*Rio Props., Inc. v. Rio Int'l Interlink,*
   284 F.3d 1007 (9th Cir. 2002)............................................................................ 22

18

19

*Schwarzenegger v. Fred Martin Motor Co.,*
   374 F.3d 797 (9th Cir. 2004) ................................................................11, 12, 13

20

21

*Television Events & Mktg., Inc. v. AMCON Distrib., Co.,*
   484 F. Supp. 2d 1124 (D. Haw. 2006) ............................................................... 19

22

23

*Universal City Studios, Inc. v. Reimerdes,*
   111 F.Supp.2d 294 (S.D.N.Y. 2000), *aff'd sub nom,*
   *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2d Cir. 2001)................. 10

24

*Vault Corp. v. Quaid Software, Ltd.,*
   775 F.2d 638 (5th Cir. 1985) .............................................................................. 17

25

26

*Wargaming.net, Ltd. v. Blitzteam LLC,*
   2021 WL 3619956 (C.D. Cal. Jan. 20, 2021)..................................................... 16

27

28

Mitchell
Silberberg &
Knupp LLP

14296541.2

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

### OTHER AUTHORITIES

Fed. R. Civ. P. 4(k)(2) ........................................................................ 12, 21

J. Ginsburg & L. Budiardjo, *Liability for Providing Hyperlinks
  to Copyright-Infringing Content: International and
  Comparative Law Perspectives,*
  41 COLUM. J. L. & ARTS 153, 184 (2018) ..................................... 11

Mitchell
Silberberg &
Knupp LLP

14296541.2

## **INTRODUCTION**

This is a copyright infringement lawsuit arising from a mobile game (titled "I Am Hero," or the "Infringing Game") intentionally distributed in the United States that blatantly infringes Plaintiff's immensely popular online game "League of Legends."  Defendants Imba Technology Company Limited ("Imba Tech"), Suga Pte., Ltd. ("Suga"), and Imba Network LLC ("Imba Network"), are three closely related companies responsible for, or otherwise participating in, the development, marketing, distribution, maintenance and exploitation of the Infringing Game.  Through these acts, Defendants knowingly caused the Infringing Game to be distributed to thousands of U.S. customers, who paid tens of thousands of dollars to Defendants via their purchase of in-game virtual goods or currency.

In an effort to evade responsibility for their unlawful conduct, two of the three Defendants, Imba Tech and Suga (together, the "Moving Defendants") have moved to dismiss the claims against them.  Their claim, in essence, is that because they are located overseas (namely, in Vietnam and Singapore) and created a U.S. shell or holding company to undertake certain administrative tasks related to the distribution of the Infringing Game, they are not subject to personal jurisdiction in this Court.[1]  Yet the Moving Defendants offer virtually nothing in the way of evidentiary support or legal authority to support their jurisdictional arguments.  Instead, the entirety of their Motion is based on a brief recitation of the legal standard and two cursory declarations.  Tellingly, Moving Defendants' declarations obscure or omit critical facts and fail to provide even the most basic information about Defendants, including what the Moving Defendants actually do, how they are related, and how they are involved with the Infringing Game.  Likewise, their threadbare legal argument ignores the relevant cases in this District holding that a foreign company's development, marketing, and exploitation of a

---

[1]  The third defendant, Imba Network LLC ("Imba Network") has not contested jurisdiction and has filed an Answer and Counterclaims.  Dkt. No. 26.

Mitchell
Silberberg &
Knupp LLP

14296541.2

video game for the U.S. market is sufficient for personal jurisdiction. *See, e.g., Blizzard Entm't, Inc. v. Joyfun Inc. Co., Ltd.*, 2020 WL 1972284, at *5 (C.D. Cal., Feb. 7, 2020); *Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL 412262, at *4 (C.D. Cal. Jan. 25, 2017).

Moving Defendants' omissions and obfuscations are deliberate.  Riot has clearly and specifically alleged, on the basis of compelling documented evidence, that ***Imba Tech*** is responsible for virtually every aspect of the Infringing Game. Imba Tech's conduct was focused on, aimed at, and designed to take advantage of the U.S. market.  Imba Tech created and developed the Infringing Game knowing and intending that it would appeal to U.S. users and Riot's fans.  It created English-language advertisements, social media pages, support pages, and chat rooms hosted by U.S. companies.  It entered into contracts with U.S. players of the Infringing Game, even providing special choice of law and venue terms for those U.S. users.  It created and regularly added multiplayer servers, including servers located in the U.S.  It updated and maintained the game.  And, it directly or indirectly distributed the Infringing Game by providing links to download locations and/or uploading new updates or builds to the Apple App Store or Google Play Store.  This is more than enough for the exercise of personal jurisdiction over Imba Tech, irrespective of whether Imba Tech delegated to its U.S. affiliate (a shell company with no office or employees) the administrative task of creating an account with Apple and Google so that the Infringing Game could be distributed on those platforms and so that they could receive U.S. dollars.

As for ***Suga***, its cursory form declaration (which is a cut-and-paste of Imba Tech's declaration) wholly ignores its ***own*** public statements and admissions, including those concerning its relationship to Imba Tech.  These admissions include, for example, that Suga: treats Imba Tech as its central gaming "division" or "brand"; shares employees with Imba Tech; is owned, operated and controlled by the same people that own, operate or control Imba Tech; provides critical

functions such as HR and related services; and touts the Infringing Game as one of its own products.  The foregoing is sufficient to satisfy Riot's light burden to establish a likely alter ego or agency relationship.  Alternatively, Riot should be granted the opportunity for discovery as to Suga's relationship to the Infringing Game and to the other Defendants.

Imba Tech and Suga are not passive foreign companies whose products happened to be imported to the U.S.  Together, these companies financed, created, distributed, marketed, and exploited the Infringing Game, intending that it would be downloaded and played by U.S. users.  Moving Defendants' Motion should be denied.  At most, the Moving Defendants have only succeeded in creating jurisdictional disputes of fact, which are properly submitted to a limited course of discovery.  If this Court has any doubt regarding the sufficiency of Riot's jurisdictional allegations, the Moving Defendants' Motion should be deferred until after Riot has had the opportunity to conduct jurisdictional discovery.

## I.   STATEMENT OF FACTS.

**Riot and the League of Legends Games.**  Riot is a video game developer and publisher based in Los Angeles, California.  Compl. ¶ 15.  Riot is in the business of producing, financing, developing, marketing, and distributing a catalog of video games and interactive entertainment products.  *Id.*  Riot's flagship game is the immensely popular game "League of Legends" ("LoL").  *Id.*  LoL is a highly competitive online game in which two teams of powerful "champions," each with a unique design and playstyle, battle head-to-head across computer-generated.  *Id.* ¶ 16.  Over the past few years, Riot has released a series of LoL mobile "spin-off" games, including "Teamfight Tactics" and "Wild Rift," featuring characters and environments first introduced in LoL.  *Id.* ¶ 15.

Millions of people around the world have played LoL, making it one of the most popular video games in the world.  Declaration of Marc E. Mayer ("Mayer Decl.") ¶ 29, Ex. 27.  The United States has the largest proportion of LoL players

and is among the most popular games played in the United States.  *Id.*

**The Infringing Game.**  At issue in this lawsuit is a mobile game titled "I Am Hero – AFK Tactical Teamfight" (the "Infringing Game").  Compl. ¶ 23. Prior to this lawsuit (at which time the game was temporarily removed from sale), the Infringing Game was available for download in the United States on the Google Play store and Apple App Store.  *Id.*; Mayer Decl. Exs. 1, 2.  As set forth in the Complaint, the Infringing Game extensively copied protectable expression from LoL and its spin-off games.  *See* Compl., ¶¶ 30-36.  Most notably, the Infringing Game contains copies of dozens of LoL's distinctive champions, including their names, backstories and lore, visual appearance, and skills and abilities.  *Id.*  Riot has alleged (and Defendants have not contested) that members of the public, including thousands of people in the United States, have downloaded the Infringing Game at least 500,000 times.  *Id.* ¶ 25; Mayer Decl. Ex. 1. (Defendants have not disclosed, and discovery would be required to determine, the precise amount of revenue received by Defendants from U.S. users.)

**Defendants And Their Relationship.**  The Infringing Game is the product of three closely affiliated companies – (1) Suga Pte, Ltd., (2) Imba Technology Company Limited, and (3) Imba Network LLC.  *See, e.g.,* Compl. ¶¶ 7-8, 22; Mayer Decl. ¶¶ 2-11.  Imba Network LLC ("Imba Network") is a Delaware corporation, which has ***not*** contested jurisdiction, has filed an Answer and Counterclaims, and is not a party to this Motion.  *See* Am. Answer (ECF No. 32). Suga Pte, Ltd. ("Suga") is a Singapore Corporation with offices in Singapore and Ho Chi Min City, Vietnam.  Compl. ¶ 7; Mayer Decl. ¶¶ 6-7, Exs. 5-6.  Imba Technology Company Limited ("Imba Tech") is a Vietnam corporation with its principal place of business in Ho Chi Min City. *Id.*; Mayer Decl. ¶¶ 4, 8, 21-22. Imba Tech formerly was known as "Suga Studio."  Mayer Decl. ¶¶ 8-9.

Defendants have deliberately obscured the relationship between these three companies, both in their public-facing materials and in the threadbare, form

declarations submitted to the Court.  The two declarations – one submitted by the CEO of Imba Tech (Tuan Minh Do a/k/a Do Tuan Minh) ("Do") (ECF No. 27-3) and the other by the CEO of Suga (Ngoc Duy Truong a/k/a Truong Ngoc Duy) ("Truong") (ECF No. 27-4) – are six sentences long, and devoid of *any* information about what each company does or how they are related to each other. Moreover, Defendants' declarations are inconsistent, as Do states (at ¶ 3) that "Suga was incorporated under the laws of *Vietnam*, has always had its principal place of business in Vietnam, and performs almost all of their corporate and business activities in Vietnam," while Mr. Truong states (at ¶ 3) that "Suga was incorporated under the laws of *Singapore*, has always had its principal place of business in Singapore, and performs almost all of their corporate and business activities in Singapore."

Without the benefit of discovery, it is impossible for Riot to determine the precise corporate relationship between Suga, Imba Tech, and Imba Network.  Imba Games has already begun to delete relevant online information in an apparent attempt to obscure the relationships.  Mayer Decl. ¶ 18.  However, Riot's investigation has revealed that the three companies are closely intertwined, work together to market and distribute the Infringing Game, and share officers, employees, offices, marketing materials, and other resources.  For example:

- In its marketing materials Suga refers to Imba Tech as a "division" of Suga – not as a separate company.  Mayer Decl. ¶ 8, Ex. 7.  Suga also sometimes refers to "Imba" as well as the Infringing Game as one of its "brands."  *Id.* ¶ 9, Ex. 8.

- Marketing materials refer to Imba Tech as "Suga Vietnam," and/or describe Suga as the "office operator" for Imba Tech.  *Id.* Ex. 5.

- Suga and Imba Tech both feature the same individual at the helm of management: Do Tuan Minh.  *Id.* ¶¶ 5, 6, 23, 24.

- Photographs of "Suga Group" employees feature employees holding

both Suga and Imba signs.  *Id.* ¶ 6, Ex. 5.

● While Suga's CEO claims in his declaration that Suga has "never… distributed anything…  in California or the United States," Suga's website states that Imba is Suga's "Game Provider", *id.* Ex. 5, and Imba's official Youtube account notes that ***"[w]e have 8 games on Google Play Store/App Store*** with some were [sic] featured on Google Play."  *Id.* Ex. 7.  Suga also distributed a powerpoint presentation in which it includes the Infringing Game as one of "***Our Games***."  *Id.* ¶ 10, Ex. 9.

● Suga's website contains a "careers" page, where it advertises positions in the Imba Tech office to work on mobile games purportedly developed by Imba Tech.  Suga requests that job applications be sent to ***Suga*** (not Imba Tech) at Suga's email address: admin@suga.vn.  *Id.* ¶ 7, Ex. 6.

**Imba Tech Developed, Marketed, and Exploited the Infringing Game for or to the U.S. Market.**  Moving Defendants apparently claim that Imba Network is or was a party to a form agreement with Apple and Google allowing it to distribute the Infringing Game on the Apple App Store and Google Play Store. Mot. at 7 (ECF No. 27).  Imba Network has consented to jurisdiction and is not a party to this Motion.  *See* Am. Answer at 2-3.  Riot's investigation has revealed that Imba Network is a shell company.  Imba Network does not have an office,[2] and does not appear to have any actual employees.  Rather, its address is that of a Delaware corporate services company and its only "employee" appears to be Do – who also is the founder and CEO of Imba Network, the CEO of Imba Tech, and (until 2020) the Chief Technology Officer of Suga.  Mayer Decl. ¶¶ 5, 6, 23, 24.

The only function of Imba Network appears to be that it is used by the other Defendants as a corporate shield to maintain a façade that it is the distributor of

---

[2] Imba Network has inconsistently represented that its address is "3000 South Dupont Highway" and "3500 South Dupont Highway."  The former does not appear to exist.  Mayer Decl. ¶ 25.  The latter is the address of "Incorporating Services, Ltd.," a corporate services firm that acts as registered agent for foreign companies.  *Id.* ¶ 25, Ex. 24.

Mitchell
Silberberg &
Knupp LLP

14296541.2

Imba Tech's (and/or Suga's) mobile games on the Apple App Store and Google Play Store.  *Id.* Exs. 1, 2.  While the Truong declaration artfully states (at ¶ 5) that "Imba Tech has never sold anything [or] distributed anything in the United States," the fact of the matter is that ***Imba Tech*** (or Suga, to the extent it operates, owns, and controls Imba Tech) is the entity that is entirely responsible for the Infringing Game.  *Id.* Exs. 1-2 (listing "Imba Games" as the developer and offeror of the Infringing Game), ¶ 5 and Ex. 4 (confirming "Imba Games" is a trade and d/b/a name for Imba Tech), Exs. 5-8 (showing Suga operates, owns and controls Imba Tech/Imba Games), Exs. 8-9 (listing the Infringing Games as one of *Suga's* "brands" and "game developments").  In doing so, Imba Tech specifically targeted the United States market and Riot's valuable intellectual property.

**Development of the Infringing Game.**  Imba Tech is the developer of the Infringing Game.  *Id.* ¶¶ 2-5, Exs. 1-4.  In other words, employees of Imba Tech designed, created, and programmed the Infringing Game.  *Id.*  These employees include at least one person located in ***San Francisco, California***, contrary to Truong's statement that "Imba Tech has never had any employees in California or the United States."  *Id.* ¶ 12, Ex. 11.

When it created the Infringing Game, Imba Tech plainly set out and intended to capture the attention of the large numbers of United States consumers who regularly play LoL or watch competitive LoL esports matches.  To do so, Imba Tech included in the Infringing Game dozens of LoL champions, using the same (or very similar) names and abilities.  Compl. ¶¶ 30-36.  Imba Tech even copied, ***verbatim***, the background (English-language) "lore" for each of these champions.  *Id.* ¶ 34.  Imba Tech knew exactly what it was doing; Imba Tech's employees are regular LoL players and fans, and they play the game regularly and competitively.  Imba Tech holds its own LoL tournament (the "Imba Cup") and posts videos and images showing its employees competing in LoL matches on its social media accounts, including Facebook and Twitter.  Mayer Decl. ¶ 13, Ex. 12.  Perhaps

most telling, Imba regularly used ***Riot-related hashtags*** on its Twitter feed to market its games, including #LeagueofLegends, #LOL, and #Teamfighttactics. Imba knew that these hashtags would cause its Tweets to be displayed to people who follow Riot's games on Twitter.  Mayer Decl. ¶ 14, Ex. 13.

Imba Tech also intended that the Infringing Game appeal specifically to U.S. players.  All of its text is in English.  (As are the marketing materials, as set forth below, Mayer Decl. Exs. 14-18).  The description of the Infringing Game in the Google Play and Apple App Store is in English.  *Id.* Exs. 1-2.  The prices for in-app purchases are in ***U.S. dollars*** (e.g. $4.99 for a "Small Limit Offer" and $.99 for a "Very Small Limit Offer.").  *Id.*  The Infringing Game's Terms of Service and Privacy Policy (which are between players and ***Imba Tech***) are in English.  *Id.* Exs. 20, 21.  Perhaps most critically, the Terms of Service specifically state:  "***If you are a resident of the United States,*** these Terms of Service and any dispute arising out of or related to it or Privacy Policy or the Service shall be governed in all respects by California law, without regard to conflict of law provisions."  *Id.* Thus, Imba tech knows and intends that its game has been and will be downloaded and played by U.S. customers – and specifically crafts policies and terms to accommodate and attract them.

In addition to the foregoing, Imba Tech maintains and manages all of the servers that enable the game to be played online (and the game can only be played online).  Throughout 2020, Imba Tech routinely added new servers, and as of early 2021 Imba Tech was running at least ***70*** online servers.  *Id.* Ex. 15.  According to Imba Tech, at least some of those servers were located in the United States.  *Id.* ¶ 21, Ex. 20 ("[w]e store information on ***servers located in the United States*** via Amazon Web Services and may store information on servers and equipment in other countries.")

**Marketing of the Infringing Game to U.S. Players.**  Imba Tech also is responsible for marketing and promoting the Infringing Game.  This marketing

specifically targeted U.S. customers.  For example:

- Imba Tech created an English language website to market the Infringing Game, located at www.playiamhero.com (the "Website").  *Id.* ¶ 15, Ex. 14.  The Website was created and is administered by Imba Tech and contains images from the Infringing Game and links to a variety of other social media sites, such as a Discord server, Facebook page, YouTube channel, Twitter feed, and Instagram account.  *Id.*  All of these social media pages are in English.  *Id.* Exs. 14-17.  The Website also contains links to the Apple and Google pages where the Infringing Game can be downloaded.  *Id.* Ex. 14.

- Imba Tech recruited English-language streamers or influencers to help promote the game.  (Its recruiting ads specifically ***required*** that the streamers use English.)  *Id.* ¶ 17, Ex. 16.  As a result of that recruiting effort, Imba Tech entered into a major promotional relationship with U.S.-based streamer "Kodeations."  *Id.* ¶¶ 19-20, Exs. 18-19.  These streamers created several videos about the Infringing Game directed to audiences in the U.S.  *Id.*

- Imba Tech offered promotions around U.S. holidays, such as Mothers' Day and Halloween.  *Id.* ¶ 17, Ex. 16.

**Engagement With and Monetization From U.S. Users.**  Public-facing information also confirms that Imba Tech (not Imba Network) is responsible for operating, supporting, maintaining, patching, and monetizing the game.  For example, Imba Tech regularly posts information to its Facebook and Twitter pages about game maintenance and features.  *Id.* Exs. 14, 15.  Imba Tech offers customer support for the game to U.S. customers, both through its social media pages and through an "Imba Support Portal" using the ZenDesk platform.  *Id.* Ex. 25.  On the Portal, Imba Tech claims that "[w]e have a mod team who always support you when you contact us 24/7."  *Id.* Ex. 26.

Critically, in order to play the Infringing Game players must agree to a Terms of Service with "Imba, a Vietnamese company" (not Imba Network).  *Id.*

¶ 22, Ex. 21.  If the player does not agree to enter into this contract with Imba Tech, then "your license to use the Service shall immediately terminate, and you must immediately stop using the Service." *Id.*  The Imba Tech Terms of Service includes a license agreement between Imba Tech and the user.  *Id.*  It also requires that players create an account and login credentials, agree to a code of conduct, agree that Imba Tech may terminate or suspend a user account for any number of reasons, and agree to grant a license to Imba Tech for the use of any content posted or created by the player.  *Id.*  Finally, the Terms of Service makes clear that all in-game purchases are transactions between **Imba Tech** ("or our authorised partners") and the player, and that all such purchases are "final and nonrefundable."  *Id.*

**<u>Distribution of the Infringing Game in the United States.</u>**  Imba Tech's claim that it did not "distribute anything" in the United States is disingenuous. While Imba Tech apparently delegated to Imba Network the administrative task of creating an Apple and Google seller account, **Imba Tech** and its employees evidently provided some or all of the software files and updates to Apple and Google (evidenced by Imba Tech's regular social media updates announcing the release or launch of new versions or fixes/patches, *id.* Exs. 14, 15).  In its promotional materials **Imba Tech** (not Imba Network) repeatedly claims to be the distributor of the Infringing Game, claiming on its Facebook page, for example, that "We Reached Top 1" on the App Store.  *Id.*, Ex. 16.

Regardless, Imba Tech directly or indirectly distributed the Infringing Game by providing links on its Website and Facebook page.  *Id.* Exs. 4, 15, 16.  These links, when clicked, bring users directly to the page on the Apple or Google store pages from which the Infringing Game could be downloaded.  *See Universal City Studios, Inc. v. Reimerdes*, 111 F.Supp.2d 294, 339 (S.D.N.Y. 2000) ("Defendants' posting and their linking amount to very much the same thing."), *aff'd sub nom,*

1    *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2d Cir. 2001).[3]

2    **II.    THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER**

3    **THE MOVING DEFENDANTS.**

4    The foregoing (uncontested) allegations far exceed the threshold "*prima*

5    *facie* showing of jurisdictional facts" required to defeat the Moving Defendants'

6    Motion. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir.

7    2004) (internal quotation marks and citation omitted).  "Although the plaintiff

8    cannot simply rest on the bare allegations of its complaint . . . , uncontroverted

9    allegations in the complaint must be taken as true. . . .  [And] [c]onflicts between

10   parties over statements contained in affidavits must be resolved in the plaintiff's

11   favor." *Id.* (internal quotation marks and citations omitted).  These evidentiary

12   burdens and presumptions apply to all jurisdictional facts, including those relevant

13   to Defendants' individual contacts with the forum ***and*** Riot's alter ego claims.  *See*

14   *ADO Fin., AG v. McDonnell Douglas Corp.*, 931 F. Supp. 711, 717 (C.D. Cal.

15   1996) ("[Plaintiff] need only make a *prima facie* showing of alter ego liability in

16   order to defeat the instant motion.").

17   The Moving Defendants devote significant space in their Motion to attack

18   the exercise of general jurisdiction, *see* Motion Section IV.B, but Riot does not

19   claim that Moving Defendants are subject to general jurisdiction in the United

20   States.  Rather, Moving Defendants are subject to ***specific*** jurisdiction under the

21   federal long-arm statute by virtue of Imba Tech's distribution, marketing,

22   monetization, support, and other exploitation of the Infringing Game in the U.S.

23

24

---

25   [3]  *See also* J. Ginsburg & L. Budiardjo, *Liability for Providing Hyperlinks to*
     *Copyright-Infringing Content: International and Comparative Law Perspectives,*
26   41 COLUM. J. L. & ARTS 153, 184 (2018) ("[A] clickable hyperlink must be
     considered part of the 'process' through which a user accesses a piece of
27   underlying content: after a user clicks a link, the HTML code embedded in the link
     begins the process of transmission by supplying the URL location of the content to
     the user's browser and instructing the browser to access that URL, after which the
28   browser completes the process of retrieving the content from the source server.")

1    Initially, because Riot's copyright infringement claims arise under federal

2    law, the federal long-arm statute, Fed. R. Civ. P. 4(k)(2), applies:

3        For a claim that arises under federal law, serving a summons . . .
         establishes personal jurisdiction over a defendant if: (A) the defendant
4        is not subject to jurisdiction in any state's courts of general
         jurisdiction; and (B) exercising jurisdiction is consistent with the
5        United States Constitution and laws.

6

7    The Motion does not address, let alone engage with, the federal long-arm statute.

8    Moving Defendants do not dispute that Riot's claims arise under federal law and

9    do not identify any specific State in which they are subject to general jurisdiction;

10   rather, they contend that jurisdiction does not exist anywhere in the United States.

11   *See Goes Int'l, AB v. Dodur Ltd.*, 2015 WL 5043296, at *7–8 (N.D. Cal. Aug. 26,

12   2015) (summarizing proof requirements under Rule 4(k)(2)).

13   Thus, the only remaining issue is whether the exercise of jurisdiction is

14   consistent with Constitutional due process.  "The due process analysis under Rule

15   4(k)(2) is nearly identical to the traditional [specific] personal jurisdiction analysis

16   with one significant difference: rather than considering contacts between the ...

17   [defendants] and the forum state, we consider contacts with the nation as a whole."

18   *Id.*; *see also Joyfun* , 2020 WL 1972284 at *5, *citing Blizzard Entm't, Inc. v.*

19   *Bossland GmbH*, 2017 WL 412262, at *4 (C.D. Cal. Jan. 25, 2017) ("The final

20   component of the Rule 4(k)(2) analysis is the same as the Ninth Circuit's test for

21   specific jurisdiction, except that instead of looking at the defendant's contact with

22   the forum state, the Ninth Circuit considers contacts with the nation as a whole.").

23   Under this Circuit's test for specific personal jurisdiction, Riot need only

24   make a *prima facie* case that (1) the nonresident defendant has (a) purposefully

25   directed his activities at the forum [the United States] or (b) purposefully availed

26   himself of the privilege of conducting activities in the forum; and (2) the claim

27   arises out of or relates to the defendant's forum-related activities.

28   *Schwarzenegger,* 374 F.3d at 802.  Once Riot has done so, the burden then shifts to

Mitchell
Silberberg &
Knupp LLP
14296541.2

12

the **Moving Defendants** to present a "***compelling case***" that the exercise of jurisdiction would "not be reasonable." *Id.* Riot easily has met its burden: it has made specific, detailed allegations regarding substantial jurisdictional contacts in this case. The Moving Defendants, for their part, have not disputed any of Riot's specific factual allegations, nor have they submitted ***any*** facts or evidence that the exercise of jurisdiction would be so unreasonable as to violate due process.

### A.   Moving Defendants Purposefully Directed Their Activities at the Forum.

Because Riot's claims arise from the unauthorized exploitation of Riot's intellectual property, the appropriate inquiry is whether the Moving Defendants "purposefully directed" their activities at the United States. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011). To establish "purposeful direction," this Court applies the "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984). This test "requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix,* 647 F.3d at 1228 (internal citations and quotation marks omitted). The Ninth Circuit recently reaffirmed that under the *Calder* test "[j]urisdiction may be constitutionally maintained in such a scenario even if the defendant never set foot in the forum state." *Burri Law PA v. Skurla*, 2022 WL 1815827, at *5 (9th Cir. June 3, 2022).

Imba Tech plainly engaged in "intentional acts" – *i.e.*, it intentionally performed "an actual, physical act in the real world." *CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 969 (C.D. Cal. 2011). Specifically, Imba Tech developed the Infringing Game, marketed and advertised it, maintained and updated it, entered into contracts with players, and provided links to ensure that potential players could easily find the Infringing Game. *See Joyfun*, 2020 WL 1972284 at *6 (intentional acts include "advertising the

Infringing Game via platforms like Facebook").  As for the other two prongs (express aiming and foreseeable injury), the evidence and undisputed allegations confirm that Imba Tech expressly aimed its conduct at the U.S., knowing that the injury would be felt by Riot here in Los Angeles.  Riot's undisputed allegations also reflect that Suga and Imba Tech are so closely intertwined that Suga also is subject to personal jurisdiction as the alter ego of Imba Tech (to the extent that Suga and Imba Tech are even different companies.)

### 1.    Imba Tech "Expressly Aimed" Its Activities At The United States.

The undisputed evidence confirms that Imba Tech was largely (if not entirely) responsible for the Infringing Game, including its development, launch, marketing, maintenance, customer support, and distribution.  In light of that evidence, Imba Tech cannot avoid U.S. jurisdiction simply by claiming that it delegated certain ministerial functions to an affiliated U.S. shell company, Imba Network.  *See also Michael Grecco Prods., Inc. v. Netease, Inc.*, 2019 WL 3245872, at *1 (N.D. Cal. July 3, 2019) (rejecting argument that corporate parent was not subject to personal jurisdiction, because "[t]he Complaint alleges that Netease and Netease IT worked together to curate American content that, allegedly, included [plaintiff's] works").  Irrespective of the relationship between Imba Tech and Imba Network, the evidence reflects that Imba Tech engaged in a variety of activities *on its own behalf* that were expressly aimed at the United States and which subject it to personal jurisdiction here.

### a.    Imba Tech Directed The Infringing Game To, Marketed To, and Engaged With, U.S. Customers.

As set forth above, Imba Tech was responsible for every single aspect of the Infringing Game, and all of its activities were designed to exploit the U.S. market.  It developed and designed the Infringing Game, ensuring that its content would be appealing and accessible to U.S. users.  It launched and maintained an English-

language marketing campaign (including through Facebook, Twitter, and other social media platforms) that was directed in whole or in part at U.S. consumers.  It made a concerted effort to partner with U.S. English-language streamers and influencers to spread the word about the Infringing Game to U.S. and Canadian audiences.  It posted advertisements and promotions around U.S. holidays.  It purchased or leased U.S.-based servers for the Infringing Game.  It created and maintained English-language support pages, chatrooms, and Discord channels.  It ensured that prices were advertised in U.S. dollars.  These are precisely the activities that Courts in this District have found to constitute express aiming.  *See, e.g., Joyfun*, 2020 WL 1972284 at *6 (express aiming where defendant held events to coincide with U.S. holidays, posted in-game currency prices in U.S. dollars, provided English-language chat rooms, and communicated with users via Discord); *3DO Co. v. Poptop Software, Inc.*, 1998 WL 962202, at *3 (N.D. Cal. Oct. 27, 1998) ("Defendants have posted a website, accessible by California residents, which permits users to download copies of the *Tycoon II* Demo.").

Moreover, irrespective of whether "Imba Network" or "Imba Tech" was listed on App stores as the "seller" of the Infringing Game, there can be little dispute that Imba Tech was in fact the company responsible for the distribution of the Infringing Game.  It regularly touted that "[w]e have 8 games on Google Play Store/App Store."  It provided multiple, prominent links on its Website and social media pages to U.S.-based app platforms where the Infringing Game could be downloaded.  It posted about content updates and patches to the Infringing Game. It promoted sales and special events.  Additionally, each time an update was applied to the Infringing Game, it necessarily was provided to consumers by Imba Tech (which created the updates.)  All of these either are acts of direct or contributory infringement of Riot's copyrights in the United States.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("Google substantially assists websites to distribute their infringing copies to a worldwide

market and assists a worldwide audience of users to access infringing materials."); *Goes*, 2015 WL 5043296, at *9 ("[D]efendants' acts of distributing infringing games to U.S. consumers and generating revenue (and diverting customers from Goes's games) are acts 'expressly aimed' at the U.S.").[4]

Finally, the undisputed evidence reflects that Imba Tech directly and intentionally engaged with players that it knew were in the United States. Every time a U.S. customer downloaded and played the Infringing Game, that customer assented to a contract (i.e., the Terms of Service) with Imba Tech. *See Colt Studio, Inc. v. Badpuppy Enters.*, 75 F. Supp. 2d 1104, 1109-10 (C.D. Cal. 1999) ("The sale of each subscription essentially involves an agreement between Badpuppy and a consumer…."). Imba Tech knew that a significant portion of these customers were in the United States, and thus included a special provision in its Terms of Service for U.S. users. Notably, the Terms of Service does not contain a similar provision for **any** other country. *See Wargaming.net, Ltd. v. Blitzteam LLC,* 2021 WL 3619956, at *3 (C.D. Cal. Jan. 20, 2021) (noting that "Defendant's terms of service are the same for all customers except for United States residents"); *Quigley v. Guvera IP Pty Ltd.*, 2010 WL 5300867, at *4 (N.D. Cal. Dec. 20, 2010) ("California-specific privacy policy" favored personal jurisdiction in California.)

Imba Tech also created an interactive English-language support site where users could find answers to questions about the Infringing Game. And, it encouraged users to join an English-language Discord "community" dedicated to the Infringing Game. *See Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*, 880 F. Supp. 743, 747 (C.D. Cal. 1995) (jurisdiction appropriate where defendant "maintains a nationwide toll-free number"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 243 F. Supp. 2d 1073,1087 (C.D. Cal. 2003) (relevant factors are "whether the defendant encouraged residents of the forum state to engage in

[4] Imba Tech's and/or Suga's decision to create a special U.S. shell company (Imba Network) confirms that the Infringing Game was directed to the U.S. market.

relevant contacts with the defendant" and "whether the defendant exchanged messages with forum residents...").

Whether the U.S. was the primary market for the Infringing Game or just one of several markets is irrelevant.  The evidence is clear that Defendants intended to make the game available and appealing to U.S. customers, knew that it had many U.S. customers, and hoped to further attract U.S. customers through advertising, influencer partnerships, and social media networks – all of which were in English.  *Joyfun*, 2020 WL 1972284 at *6 ("Zroad HK has done more than merely distribute a game for a worldwide audience or advertise to U.S. customers. Blizzard persuasively demonstrates that Zroad HK, along with the other Defendants, targets American players.")  Thus, Defendants knew that their activities would reach the U.S. market – and they made every effort to ensure that the U.S. was included.  *See Vault Corp. v. Quaid Software, Ltd.*, 775 F.2d 638, 640 (5th Cir. 1985) (personal jurisdiction proper where defendant "made no attempt to limit the states in which its product was marketed").

### b. Defendants Aimed Their Infringing Conduct At Riot, A U.S. Company Based In California.

"Express aiming" further is demonstrated by the fact that Defendants "individually targeted" ***Riot***, which they knew was a U.S. company based in California.  "[T]he Ninth Circuit has held that specific jurisdiction exists where a plaintiff … alleges that defendant intentionally infringed its intellectual property rights knowing [the plaintiff] was located in the forum state.' *California Brewing Co. v. 3 Daughters Brewing LLC*, 2016 WL 1573399, at *3 (E.D. Cal. Apr. 19, 2016) (internal quotations and citations omitted); *see also Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093, 1106 (C.D. Cal. 2007) (specific jurisdiction exists "where a plaintiff brings suit in its home forum against an out-of-state defendant, alleging that the defendant engaged in infringing activities knowing that plaintiff was located in the forum").  *See also Burri Law*, at *7

1  (defendant engages in express aiming when its conduct is "for the very purpose of

2  having their consequences felt in the forum state.")

3       Review of the Infringing Game (including the numerous exemplars set forth

4  in the Complaint) confirms that Defendants intended to exploit Riot's copyrights.

5  The Infringing Game does not simply use fantasy or science fiction archetypes; it

6  created rip-off versions of dozens of LoL characters and gave those characters

7  nearly identical names (e.g. "Victor" instead of "Viktor," "Tolan" instead of

8  "Talon," "Dinger" instead of ""Heimerdinger"), identical background stories, and

9  similar visual features and abilities.  Additionally, Imba Tech used the names of

10  Riot games as a marketing tool to attract customers, such as by including the

11  hashtag #Leagueoflegends in its Tweets.

12       Since Riot is one of the most well-known video game companies in the

13  world, and Imba Tech admits that its developers are competitive LoL players, it

14  certainly knew that by copying Riot's intellectual property it would be causing

15  harm in the United States.  *See Bossland*, 2017 WL 412262, at *4 ("Bossland had

16  to anticipate that Blizzard, a company well known to be based in the United States,

17  would suffer loss in the United States as a result of Bossland's software."); *3DO,*

18  1998 WL 962202, at *4 ("The computer game industry is primarily located in

19  California.  Therefore, Defendants' conduct is likely to have an effect in the forum

20  state.").  If there were any remaining doubt that Imba Tech knew that it was

21  infringing Riot's rights, it should have been put to rest by the comments posted by

22  consumers notifying them about its exploitation of Riot intellectual property.

23  Compl. ¶ 38.  Imba Tech responded to these comments, ***acknowledging*** the

24  similarities between the Infringing Game and LoL.  *Id.* ¶ 39.

25          **2.**    **The Harm to Riot was Foreseeable.**

26       "[A] corporation incurs economic loss, for jurisdictional purposes, in the

27  forum of its principal place of business."  *CollegeSource, Inc. v. AcademyOne,*

28  *Inc.,* 653 F.3d 1066, 1079 (9th Cir. 2011).  *See also Mountz v. Northeast Indus.*

*Bolting & Torque, LLC*, 2016 WL 6699295, at *5 (N.D. Cal. Sept. 30, 2016) ("Where, as here, a party brings a claim for infringement of intellectual property, [i]t is foreseeable that the loss will be inflicted both in the forum where the infringement took place . . . and where the copyright holder has its principal place of business.") (internal quotation marks omitted); *see also Hydentra HLP Int'l Ltd. v. Sagan Ltd.*, 783 Fed. Appx. 663, 665 (9th Cir. 2019) (intentional act of infringement is sufficient to establish foreseeable harm in the plaintiff's principal place of business). This prong is met even if the defendant claims to be unaware of the plaintiff's location (which plainly is not the case here.) *See Brackett v. Hilton Hotels Corp.*, 619 F. Supp. 2d 810, 818 (N.D. Cal. 2008). It obviously was foreseeable that the distribution and marketing of a game containing Riot's valuable intellectual property would harm Riot in the U.S.

**B.  Moving Defendants Also Are Subject To Personal Jurisdiction Under Alter Ego Or Agency Theories.**

The Court *also* may exercise jurisdiction over both Imba Tech and Suga because the evidence is sufficient to meet Riot's light burden at this stage that *all* of the Defendants are so closely intertwined that they are alter egos or agents of each other. *See ADO*, 931 F. Supp. at 715 ("Under the federal law governing the exercise of *in personam* jurisdiction, if a corporation is the alter ego of an individual defendant, or one corporation the alter ego of another, the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly.").

Under the alter ego doctrine, one corporation may be liable for the actions of another where it is shown that "'(1) there is such unity of interest and ownership that the separate personalities of [the corporations] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.' " *Grokster*, 243 F. Supp. 2d at 1098. "[T]he standard for personal jurisdiction under an alter ego theory is lower than the standard for liability under an alter ego theory." *Television Events & Mktg., Inc. v. AMCON Distrib., Co.*, 484

1   F. Supp. 2d 1124, 1142 (D. Haw. 2006).

2      There is and can be no dispute that Imba Network is a shell corporation or

3   agent for Imba Tech and/or Suga.  Imba Network does not have an office, does not

4   have employees, was created by and is operated by the same individuals that own

5   and operate Imba Tech and Suga (*e.g.,* common ownership), and provides services

6   exclusively for these two companies (*e.g.*, common interest).

7      Riot also specifically alleged (undisputed) facts sufficient to establish that

8   Imba Tech and Suga have an alter ego relationship for purposes of personal

9   jurisdiction, if not liability.  They share offices, phone numbers, employees, and

10  owners.  Suga recruits and hires Imba Tech staff and employees.  It refers to Imba

11  as its central (and sole) "brand" or "division" of the company in the gaming

12  industry.  It claims to be in the business of game development by way of Imba

13  Tech, and even touts the Infringing Game as among its catalog of games.  By

14  contrast, Defendants have failed to offer even a single piece of evidence to

15  establish that they are independent companies with a separate corporate existence.

16  In fact, the declarations submitted by Imba Tech and Suga do not contain even a

17  single sentence explaining the nature of their business and their relationship.[5]

18     The foregoing is sufficient at this (lowered burden) stage to impute Imba

19  Tech's and Imba Network's U.S. contacts to Suga.  *RAE Sys., Inc. v. TSA Sys.,*

20  *Ltd.*, 2005 WL 1513124, at *3-4 (N.D. Cal. June 24, 2005) (allegations of "unity of

21  interest and ownership" was sufficient, even if contradicted by defendants'

22  declarations).  Alternatively, the evidence is sufficient to warrant jurisdictional

23  discovery so that Riot can more fully assess the relationship between the

24  Defendants and, if necessary, amend its complaint to ensure that all relevant

25

26  [5]  The statement in both the Do and Truong declarations that Imba Tech or Suga "does not own or have any shares in Imba Network, LLC" is misleading.  Do is the

27  CEO of Imba Tech, the founder and CEO of Imba Network, and was formerly an officer of Suga.  Thus, there certainly is common ownership and control amongst

28  the three companies, even if Do and Truong created the fiction of corporate separation by manipulating stock ownership.

1    persons and entities have been included in this lawsuit.

2         **C.    Riot's Claims Arise out of Defendants' U.S. Activity.**

3         For this prong of the jurisdictional analysis, the Ninth Circuit applies a "but

4    for" test, which requires the plaintiff to demonstrate that its claims would not have

5    occurred but for defendant's contacts with the forum state.  *Ballard v. Savage*, 65

6    F.3d 1495, 1500 (9th Cir. 1995).  That test easily is met here.  This case is about

7    Defendants' infringement of Riot's intellectual property rights in the U.S.  U.S.

8    players would not have downloaded and played the Infringing Game if it were not

9    for Defendants' development, marketing, distribution, maintenance, and support

10   for the Infringing Game.  *See, e.g., AMA Multimedia LLC v. Sagan Ltd.*, 2016 WL

11   5946051, at *5-6 (D. Ariz. Oct. 13, 2016) (Rule 4(k)(2) "but for" test satisfied

12   because: "[defendant's website] anticipated, desired and achieved a substantial

13   [United States] viewer base with the intent of commercial gain. …  [The website's]

14   alleged infringement of [plaintiff's] copyrighted works would serve only to further

15   the purpose of growing the United States viewership for commercial gain.  What is

16   more, [defendant's website] specifically targeted [plaintiff's] content, knowing

17   [plaintiff] was a United States company protected by United States copyright laws,

18   and proceeded to post that content in the United States....").

19        **D.    The Exercise of Jurisdiction is Not Unreasonable.**

20        Moving Defendants have not come close to carrying their heavy burden of

21   proving that the exercise of jurisdiction would be ***unreasonable***.  Instead, their

22   only argument seems to be that, as a matter of convenience, they would prefer that

23   Riot – a Los Angeles-based company – bear the burden of having to litigate its

24   ***U.S.*** copyright law claims in Singapore and Vietnam.  Leaving aside the inherent

25   unfairness of requiring a U.S. company to litigate U.S. infringement claims

26   overseas based on a game distributed and played by thousands of U.S. players,

27   Moving Defendants' claim is irrelevant.  "[I]t is not enough that the [defendant]

28   demonstrate that some other forum is more reasonable than California, [defendant]

Mitchell
Silberberg &
Knupp LLP
14296541.2

must show a due process violation; [defendant] must show that jurisdiction in California would make the litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to [its] opponent." *See Jeske v. Fenmore*, 2008 WL 5101808, at *6 (C.D, Cal. Dec. 1, 2008) (internal citations and quotation marks omitted). Moving Defendants never claim that they are unable to litigate the claims here (in fact, their affiliate Imba Network already will be defending the case here), just that it would be inconvenient for them.

The Ninth Circuit considers seven factors in determining reasonableness. *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002) (listing factors). Not one of the factors weighs against jurisdiction, far less presents a "compelling" reason to deny jurisdiction.

**(i)    Extent of Purposeful Interjection**. Moving Defendants' claim that they did not "inject" themselves into the U.S. market is contrary to the facts. Defendants interjected themselves into the U.S. market by creating the Infringing Game, causing it to be distributed in the U.S., marketing it in the U.S., entering into contracts with U.S. users, offering customer support and chat room support to U.S. customers, and collecting money from U.S. customers. They did so intending to harm Riot. See AMA Multimedia, 2016 WL 5946051, at *5 (defendant's website targeted the U.S. market for commercial gain).

**(ii)    Burden of Defending in the Forum.** "[I]n almost any case where the defendant does not reside in the forum state, some additional inconvenience is inevitable." *Indiana Plumbing*, 880 F. Supp. at 748. Moving Defendants have not offered evidence to support their claim that it would be "extremely burdensome" for them to defend this action in the United States. For example, Moving Defendants do not identify any witnesses who would be unable to testify at trial or deposition, any documents that could not be transported to California, or physical barriers to defending the case here. The Ninth Circuit has recognized that "modern means of communication and transportation have tended to diminish the burden of

defense of a lawsuit in a distant forum." *Id.* (internal citations and quotations marks omitted).  Imba Network is located in the United States and has appeared through the exact same U.S. counsel that represents Imba Tech and Suga.  In the meantime, all major third-party witnesses are located in the United States, as are all relevant Riot witnesses (including its artists, designers, and licensing team).

**(iii)   Extent of Conflict With the Sovereignty of the Defendant's State.** Defendants do not identify any purported conflict with the sovereignty of Singapore or Vietnam.  Riot's complaint addresses Defendants' violations of Riot's rights in the ***United States***.  *See LiveCareer Ltd v. Su Jia Techs. Ltd.*, 2015 WL 1448505, at *9 (N.D. Cal. Mar. 31, 2015) ("Here, although Cyprus has some interest in regulating the conduct of its corporations, [plaintiff's] complaint only raises questions of U.S. law.").  This Court need not adjudicate any issues of Vietnamese or Singapore law.

**(iv)   Forum State's Interest in Adjudicating the Dispute.**  "The United States has a significant interest in resolving disputes of United States copyright law involving infringement by foreign defendants." *AMA Multimedia*, 2016 WL 5946051, at *7.  The United States (and California in particular) has a particular interest in protecting Riot, a California-based company.

**(v)   Most Efficient Judicial Resolution of the Controversy.**  Because this dispute involves infringements in the United States, under U.S. copyright law, a court in Singapore or Vietnam cannot effectively or efficiently decide the issues presented here.  *See Lafarge Canada, Inc. v. Bank of China,* 2000 WL 1457012, at *3 (S.D.N.Y. Sept. 29, 2000) (denying motion for forum non conveniens: "[The] Court is not persuaded that the courts in China will apply the appropriate United States law as efficiently as a court in the United States."); *Halo Creative Design Ltd. v. Comptoir Des Indes Inc.,* 816 F.3d 1366, 1371 (Fed. Cir. 2016) ("[T]here is no indication that Canadian citizens could successfully sue in Canada with respect to exclusively extraterritorial infringement.").

**(vi)  Importance of the Forum to the Plaintiff's Interest in Convenient and Effective Relief.**  As discussed above, Riot can only effectively and conveniently obtain relief for its U.S. federal law claims in a U.S. Court.

**(vii)  Existence of an Alternative Forum.**  There is no alternative forum, and Defendants have not offered any evidence that this matter could be handled effectively by a court in Singapore or Vietnam.  Moving Defendants' assertion that "Suga and Imba Tech are unaware of any basis for concluding that Singapore or Vietnam is not an adequate alternative forum" is not sufficient to meet their heavy burden of proving that a U.S. forum would violate due process.

## III.  AT MINIMUM, RIOT IS ENTITLED TO JURISDICTIONAL DISCOVERY.

Even without the benefit of formal discovery, Riot has satisfied its burden of making a *prima facie* showing of personal jurisdiction.  However, if the Court determines that Riot has not made a *prima facie* showing, Riot requests that the hearing on this motion be continued and Riot be permitted to take discovery on jurisdictional and alter ego issues.  *See Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672-73 (S.D. Cal. 2001).[6]  *See also Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames, LLC*, 2021 WL 5861279, at *1 (9th Cir. Dec. 10, 2021) ("The question of jurisdiction in the Internet age is not well-settled" and "discovery… might well demonstrate facts sufficient to constitute a basis for jurisdiction."), *quoting Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements*

---

[6]  Riot should be entitled to discovery on facts such as, without limitation, (a) the relationship between the Defendants, and the manner by which each Defendant contributed to the creation and distribution of the Infringing Game, (b) the identity of all persons and entities who developed the Infringing Game, (c) the nature and extent of Defendants' marketing of the Infringing Game; (d) the number of U.S. users that downloaded and played the Infringing Game; (d) the amount of money received from U.S. users, (e) communications with U.S. users, and (f) Defendants' corporate structure, observance of formalities, capitalization, business operations, officers/directors, and employees.  *See Good Job Games* 2021 WL 5861279, at *1.

Mitchell
Silberberg &
Knupp LLP
14296541.2

*Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

Courts have broad discretion to authorize jurisdictional discovery upon a "colorable showing" that personal jurisdiction exists. *See eMag Sols., LLC v. Toda Kogyo Corp.*, 2006 WL 3783548, at *2 (N.D. Cal. Dec. 21, 2006), citing *Orchid Biosciences* at 672-673 ("[A] plaintiff is not obligated to make out a 'prima facie' case of personal jurisdiction before it can obtain limited jurisdictional discovery, because '[i]t would … be counterintuitive to require a plaintiff, *prior* to conducting discovery, to meet the same burden that would be required to defeat a motion to dismiss.'"); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F. 2d 1280, 1285 n.1 (9th Cir. 1977) (jurisdictional discovery may be allowed "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary").  Moreover, such discovery regularly is granted in cases involving alter ego allegations. *See Harris Rutsky*, 328 F.3d at 1135 (remanding for discovery on alter ego issues because "[f]urther discovery on this issue might well demonstrate facts sufficient to constitute a basis for jurisdiction").  Riot has made far more than a "colorable showing." Accordingly, if the Court has any doubt as to the exercise of jurisdiction, jurisdictional discovery – not dismissal – is the proper remedy here.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion to Dismiss.  At minimum, the Court should permit jurisdictional discovery before ruling on the Motion.

DATED: JUNE 13, 2022          MITCHELL SILBERBERG & KNUPP LLP


By:  */s/ Marc E. Mayer*
          Marc E Mayer
          Attorneys for Riot Games, Inc.