1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIOT GAMES, INC., a Delaware corporation,<br><br>                                Plaintiff,<br><br>          v.<br><br>SUGA PTE, LTD., a company incorporated under the laws of Singapore, SUGA CO., LTD., a company incorporated under the laws of Vietnam, IMBA TECHNOLOGY COMPANY LIMITED, a company incorporated under the laws of Vietnam; IMBA NETWORK LLC, a Delaware Limited Liability Co.; and DOES through 10, inclusive.<br><br>                                Defendants. | Case No. 2:22-cv-00429-SPG-KS<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [ECF No. 71].** |

      Before the Court is Defendants Suga PTE, LTD.'s ("Suga Singapore") and Suga CO., LTD.'s ("Suga Vietnam") (collectively the "Suga Defendants") Motion to Dismiss Plaintiff Riot Games, Inc.'s First Amended Complaint ("FAC") for Lack of Jurisdiction and *Forum Non Conveniens* ("Motion"). (ECF No. 71 ("Mot.")). Plaintiff opposes. (ECF No. 76 ("Opp.")). Having considered the parties' submissions, the relevant law, the record

in this case, and the arguments during the hearing on the Motion, the Court DENIES the Motion.

## I.     BACKGROUND

### A.     Factual Background

This case arises out of alleged copyright infringement of Plaintiff Riot Game's well-known game, League of Legends ("LoL") and its various spin-offs. *See, e.g.*, (ECF No. 62 ("FAC") ¶¶ 25–31; 43–53). Plaintiff alleges that "LoL is among the most popular games in the world, played by more than 100 million people each month," and that "LoL's iconic and colorful 'champions' are recognized throughout the world." (*Id.* ¶ 1). The FAC brings a copyright infringement cause of action against Defendants for their alleged LoL "knock-off" game titled, "I Am Hero: AFK Tactical Teamfight" (the "Game"). (*Id.* ¶ 3).

The Court incorporates by reference its recitation of the facts from its prior order granting in part and denying in part Defendants Suga Singapore and Imba Technology Co. Ltd's ("Imba Tech") motion to dismiss Plaintiff's complaint. *See* (ECF No. 50 ("Order") at 2–3).

#### 1.     The Parties

Plaintiff is based in Los Angeles, California, and produces, develops, publishes, distributes, and markets a catalog of video game products, including LoL. (*Id.* ¶ 9). Defendants are a group of companies incorporated in the United States, Singapore, and Vietnam. Specifically, Imba Tech is a mobile game development studio with its principal place of business in Ho Chi Min City, Vietnam. (FAC ¶ 13). The Court previously found that personal jurisdiction over Imba Tech was proper. (Order at 6–17).

Defendant Suga Vietnam is a Vietnam corporation with an office building in Ho Chi Minh City. (ECF No. 76-1 at 18). According to the documents the parties have submitted to the Court regarding jurisdiction, Suga Vietnam was founded by Duy Ngoc Truong ("Truong"), Do Tuan Minh ("Minh"),[1] and Nguyen Khoa Lanh. (*Id.* at 42, 105). Truong

---

[1] The parties refer to Minh using different short names but, given that Truong refers to him as "Minh" in his deposition, the Court will use "Minh."

is the CEO of Suga Vietnam and operates both Suga Vietnam and Suga Singapore out of the Suga Vietnam office. (*Id.* at 19 ("[A]ctually SUGA [Singapore] did not have employee, it [is] just a representative for SUGA [Singapore] in Singapore to run its operation in Vietnam.")). Suga Vietnam hires a few staff members, including people who answer the phone for Suga Singapore. (*Id.* at 23–24). It is not clear who the owners of Suga Vietnam are. For example, Suga Vietnam's website includes "core members" that Truong refers to as "owners of the company" because these individuals "contribute" to the company, but "on the paperwork they are not [owners]." (*Id.* at 43). According to Truong, formalized paperwork was unnecessary because "we trust each other. We work together. We contribute our work. We do not need some kind of document to determine who would be the real shareholder, how many percent, each person [sic]." (*Id.* at 44).

Defendant Suga Singapore is incorporated in Singapore where it also files its public financial statements. (FAC ¶ 11). Suga Singapore was founded by Truong, Minh, "Tommy," "Lanh Khoa Nguyen and Cuong Viet Do." (ECF No. 76-1 at 19). Suga Singapore is "majority owned" by Truong. (FAC ¶ 11). Truong, who appeared as Suga Singapore's Rule 30(b)(6) witness during jurisdictional discovery, is also the CEO, sole officer, and manager of Suga Singapore. (*Id.*). While Truong claims he is the sole CEO, (ECF No. 76-1 at 19–21)), some documents list Minh as the CEO, CTO, or point of contact for Suga Singapore. (*Id.* at 58–59; ECF No. 92-1 at 26, 152). Suga Singapore owns a Singapore bank account, which Plaintiff alleges is where monies earned from the Game are held. (ECF No. 76-1 at 66–70).

Defendant Imba Tech was formed by Minh and Truong sometime after they co-founded Suga Vietnam and Suga Singapore. *See* (FAC ¶ 13). Imba Tech describes itself as a "division" of Suga Vietnam but claims that Minh is the only individual or entity that possesses any ownership or financial interest in Imba Tech. (*Id.*; ECF No. 76-1 at 220–21). Upon Imba Tech's establishment, Truong and Suga Vietnam provided funds to Imba Tech to help it operate. (*Id.* at 48–49). Suga Vietnam provided these transfers "[m]any times," and Truong sometimes would "sell some estate or land or house to help Imba []

grow." (*Id.* at 50–51).  These transfers were not loans and were not subject to any written agreement.  (*Id.* at 48; 51).  Plaintiff alleges that Minh treats Imba Tech and the Suga Defendant companies interchangeably.  *See* (FAC ¶¶ 14–15, 32).  Imba Tech lists Suga Vietnam's contact information as its own.  (*Id.* ¶ 13).  Imba Tech does not maintain its own bank account and instead uses the account belonging to Suga Singapore.  (ECF No. 76-1 at 69–70).

Defendant Imba Network LLC ("Imba Network"), is a limited liability company registered under the laws of Delaware, (FAC ¶ 16), and has already conceded personal jurisdiction.  (Order at 4 (citing ECF No. 33 at 27–28).  The purpose of Imba Network was to serve as the "seller" of the Game in the Apple App store and other distribution platforms and publish games of Suga Singapore.  (*Id.;* ECF No. 92-1 at 5).  Imba Network was formed as part of a transaction between U.S.-based company and publishing partner, N3twork, Inc. ("N3twork), and the Defendant companies.  *See, e.g.*, (ECF No. 76-1 at 71; ECF No. 92-1 at 2–27).  According to the Limited Liability Company Agreement provided to the Court ("Imba Network Agreement"), Minh and Le Giang Anh ("Anh") are the two managers of Imba Network, and Suga Singapore is the sole member and owner of Imba Network.  (ECF No. 92-1 at 5, 8, 26).

## 2.   The Game

In or about 2020, the Defendants released the Game on the Google Play and Apple App stores.  (FAC ¶ 3).  Plaintiff alleges that the Game is purposefully designed as a LoL knock-off: the Game's title is a "reference to Plaintiff's 'Teamfight Tactics,'" the Game features a roster of heroes visually and narratively similar to LoL's champions and, "in many instances, the [Defendants] lifted whole paragraphs of textual material verbatim from LoL."  (*Id.* ¶ 6 (emphasis omitted)).  The Game is largely "free-to-play."  (*Id.* ¶ 34).

Truong represents in his declaration that he and the Suga Defendant companies had "no direct involvement regarding the development, sale, marketing and/or distribution" of the Game.  (ECF No. 71-2 ("Truong Decl.") ¶ 11).  According to Truong's deposition testimony during jurisdictional discovery, Imba Tech was the only entity that developed

the Game, (ECF No. 76-1 at 54), and the Game is "Imba property," only "belong[ing] to Imba." (*Id.* at 61).

Plaintiff alleges that all the Defendants owned and developed the Game. *See, e.g.*, (FAC ¶ 2). While Truong testified that Suga Singapore and Suga Vietnam were not involved with the development of the game, Truong also acknowledges that he and the Suga Defendants provided money to Imba Tech that was used to "develop games like . . . I Am Hero." (ECF No. 76-1 at 54). The Game's Vietnamese copyright registration lists Minh as the author, but Suga Vietnam as the owner. (*Id.* at 60–63; ECF No. 92-1 at 155). Truong claims that he "did not really pay attention if the right belonged to [Suga Vietnam] or Imba." (ECF No. 76-1 at 60–62). Further, Truong is named as the "manager" for the domain name, playiamhero.com, that hosted the Game. (ECF No. 192-1 at 160–63).

Though this Court found Imba Tech was the Game's listed seller on distribution platforms like Google Play store, (Order at 9), Plaintiff alleges that Minh was using Imba Tech, Imba Network, and Suga Defendant companies interchangeably, each as "the agent of the other," to negotiate publishing and marketing rights for the Game. *See, e.g.*, (FAC ¶¶ 14–20). On December 12, 2020, Suga Singapore and N3twork, Inc. ("N3twork") entered into a contract to publish and market the Game in the United States (the "N3twork Contract"). (FAC ¶ 37; ECF No. 92-1 at 136–54). Though Minh was the primary negotiator of the N3twork Contract, he communicated with N3twork using his Suga Vietnam email address. (ECF No. 76-1 at 58–59; ECF No. 92-1 at 136–54). However, it was Truong who signed the N3twork Contract on behalf of Suga Singapore but kept Minh's email address in the signature line. (ECF No. 92-1 at 152; ECF No. 76-1 at 58–59).

The N3twork Contract, which provides it is governed by California law with a California arbitration clause, *see* (ECF No. 92-1 at 151), gave N3twork exclusive distribution and marketing rights and required that the Developer, Suga Singapore, would cooperate with N3twork by, for example, ensuring "server support sufficient to accommodate all user traffic," and "submitting builds of the Game to the Authorized Platforms to enable their commercial release." (*Id.* at 137). The N3twork Contract also

maintained that Suga Singapore would remain "solely responsible for all design, development, production, maintenance, hosting and operation of the Game." (*Id.*).  Imba Tech is not mentioned in the N3twork Contract, but Truong claims that, "[a]fter signing the initial platform agreements with Apple & Google, Suga [Singapore] transfer[ed] all assets in the 'I AM HERO' game over to Defendant Imba Tech." (Truong Decl. ¶ 12). Truong and Suga Singapore acknowledged that they never "sign[ed] any other contract with Imba Network," such as a written agreement that "assigned or delegated any rights or obligations of this [N3twork C]ontract," and there were no amendments to the N3twork Contract.  (ECF No. 76-1 at 65).

The N3twork Contract required the Developer, Suga Singapore, to transfer the Game "from Developer to Developer's wholly owned affiliate LLC." (*Id.* at 71; ECF No. 92-1 at 136).  On December 18, 2020, per the Imba Network Agreement, Minh and Anh formed Imba Network, as the only two managers.  (ECF No. 92-1 at 26).  As previously stated, Suga Singapore is named as the initial and sole member and "agree[d] to be bound by all the terms and provisions of this Agreement and to perform all obligations imposed upon a Member pursuant to this Agreement." (*Id.* at 5–6).[2]  Under Suga Singapore's signature line on the Imba Network Agreement, Minh is listed as its "Chief Executive Officer." (*Id.* at 26).

Under the N3twork Contract, N3twork was obligated to pay Suga Singapore $25,000 per month as an advance on the proceeds from the Game.  (ECF No. 76-1 at 66–70). Truong testified that Suga Singapore received approximately "$20,000 or $25,000 [per] month" from N3twork.  (*Id.* at 66–67).  Suga Singapore would then "send [the money] to Imba." (*Id.* at 68).  Imba Tech did not have its own account to receive the money because according to Truong, it would be a "very complicated process . . . to go through tax

---

[2] Truong's declaration represents: "I can further attest that to my knowledge, information and belief, Suga [Singapore] and Suga [Vietnam] does [sic] not own or have any shares in Imba Network, LLC." (Truong Decl. ¶ 5).  However, this representation appears to be contradicted by the LLC Agreement that formed Imba Network. *See* (ECF No. 92-1 at 8 ("[T]he initial Member solely and exclusively owns 100% of the Class . . . ."); *id.* at 26).

auditing." (*Id.* at 69). There is no formal documentation of any money transfers, and "Imba has the access to [Suga] account to upload or to transfer whatever." (*Id.* at 72).[3]

### B. Procedural History

The Court previously found that it has personal jurisdiction over Imba Tech and Imba Network did not contest personal jurisdiction. (Order at 6–17). However, the Court dismissed without prejudice the Plaintiff's complaint as to Suga Singapore because the evidentiary record at the time did not demonstrate that Suga Singapore had sufficient control over Imba Tech to justify the use of alter ego liability, which was the only theory Plaintiff previously asserted as a basis for personal jurisdiction over Suga Singapore. (*Id.* at 17–19). The Court ordered jurisdictional discovery to allow Plaintiff to ascertain the relationship between Suga Singapore and Imba Tech. (*Id.* at 19–20).

Plaintiff engaged in jurisdictional discovery, including taking a Rule 30(b)(6) deposition of Suga Singapore and written discovery, which resulted in the production of several documents regarding Defendants Imba Tech, Imba Network, and the Suga Defendants' corporate structures, contracts, and activities. *See* (ECF No. 76-1 at 2–6). On April 10, 2023, Plaintiff filed the operative FAC, renaming Suga Singapore and adding Suga Vietnam as defendants. *See* (FAC ¶ 12). The Suga Defendants have moved to dismiss the FAC based on personal jurisdiction, or alternatively based on *forum non conveniens.* Plaintiff opposes, *see* (Opp.), and Defendants have timely replied. *See* (ECF No. 80 ("Reply")).

## II. LEGAL STANDARD

### A. Personal Jurisdiction

"For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the

---

[3] Again, Imba Tech's access to the Suga Defendants' bank account appears to be contradicted in Truong's declaration, where he represents that Suga Singapore and Suga Vietnam maintain their own separate bank accounts and do not share them with any other entity. (Truong Decl. ¶ 7).

exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts may be established via general jurisdiction or specific jurisdiction. General jurisdiction exists when a defendant's contacts with the forum state are "so continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotations and citation omitted). Specific jurisdiction exists when the plaintiff's claims or causes of action "arise out of or relate to" the defendant's contacts with the forum state. *See Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472–73 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Even if a defendant has "sufficient minimum contacts," the court must also find that the exercise of jurisdiction is reasonable. *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1136 (S.D. Cal. 2018) (citing *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)).

Upon a foreign defendant's challenge to personal jurisdiction in the United States, a federal court may assess the propriety of jurisdiction using Federal Rule of Civil Procedure 4(k)(2) (i.e., the federal long-arm statute). *See Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007). In analyzing whether Rule 4(k)(2) allows a court to exercise personal jurisdiction over a foreign defendant, "the United States serves as the relevant forum for a minimum contacts analysis." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir. 2002) (citations omitted). Rule 4(k)(2) allows a federal court to exercise personal jurisdiction over a foreign defendant if the following requirements are met: (1) the "claim against the defendant must arise under federal law"; (2) "the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction"; and (3) "the federal court's exercise of personal jurisdiction must comport with due process." *Holland Am. Line, Inc.*, 485 F.3d at 461 (citations omitted). This due process analysis is "nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than consider the contacts between the

[defendants] and the forum state, [the court] considers the contacts with the nation as a whole." *Id.* at 462 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006)).

**B.    Rule 12(b)(2)**

Federal Rule of Civil Procedure 12(b)(2) allows a court to dismiss a complaint for lack of personal jurisdiction. "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger*, 374 F.3d. at 800 (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).    In determining whether jurisdiction is appropriate, the court is permitted to consider evidence introduced by declaration or affidavit and it may order jurisdictional discovery, if necessary. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (per curiam) (citation omitted).    If the motion to dismiss for lack of personal jurisdiction is not based upon an evidentiary hearing and is based solely upon written materials, a "plaintiff need only make a prima facie showing" of facts supporting jurisdiction to survive the motion. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).    Although the plaintiff cannot "simply rest on the bare allegations of its complaint," uncontroverted allegations in the complaint must be taken as true by the court. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (citation omitted).    Courts "may not assume the truth of allegations in a pleading which are contradicted by affidavit but [will] resolve factual disputes in the plaintiff's favor." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (internal citations and quotation marks omitted).

**C.    Forum Non Conveniens**

*Forum non conveniens* is an "exceptional tool to be employed sparingly." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.2002).    When a party moves to dismiss on the grounds of *forum non conveniens*, it must show two things: "(1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal." *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764, 767 (9th

Cir. 1991) (citing *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1448–49 (9th Cir.1990)). The defendant's showing must overcome the "great deference" due to plaintiffs who sue in their home forum. *Id.* (quoting *Contact Lumber*, 918 F.2d at 1449); Unless the private interest and public interest factors "strongly favor trial in a foreign country," a plaintiff's choice of forum will not be disturbed. *CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 965 (C.D. Cal. 2011) (quoting *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir.2001)).

## III. DISCUSSION

The Suga Defendants argue the FAC should be dismissed because this Court lacks personal jurisdiction over them as foreign corporations. Specifically, they assert that they perform all their corporate and business activities exclusively in either Singapore or Vietnam, do not have substantial and continuous contacts in the United States, and thus the Court does not have general jurisdiction over them. (Mot. at 10, 13–16). Further, they argue that specific jurisdiction is also lacking because they have no contacts with California and Plaintiff has failed to show the defendants are alter egos of each other. (*Id.* at 10, 16–29). Alternatively, the Suga Defendants argue that the Court should dismiss the action based on *forum non conveniens* so that the action can be heard in the courts of Singapore or Vietnam. (*Id.* at 11, 30–34).

In response, Plaintiff argues that the Suga Defendants have sufficient minimum contacts with the forum through their own acts such that this Court can exercise personal jurisdiction over them.[4] (Opp. at 6–7, 14–17, 24–25). Alternatively, Plaintiff argues the Suga Defendants are subject to personal jurisdiction because all of the named defendants are alter egos of each other. (*Id.* at 6–7, 19–23). Additionally, Plaintiff argues that, through their execution of the N3twork Contract, the Suga Defendants consented to jurisdiction in California and, in any event, they have not satisfied their burden of demonstrating that a

---

[4] Plaintiff does not argue that this Court has general jurisdiction over the Suga Defendants. (Opp. at 14).

California forum is inconvenient.  (*Id.* at 7, 25–29).  The Court addresses each party's arguments in turn.

### A.      Specific Jurisdiction Over the Suga Defendants

As an initial matter, the Court notes that the Court's prior finding regarding the application of the federal long-arm statute under Rule 4(k)(2) to Imba Tech also holds true as to the Suga Defendants.  Specifically, because Plaintiff sues the Suga Defendants under federal copyright law, the first Rule 4(k)(2) requirement is met.

For the second requirement, Plaintiff is not required to establish a lack of jurisdiction in every other state; instead, the second requirement is met if the Suga Defendants have failed to select another state within the United States where jurisdiction is appropriate.  *See Holland Am. Line, Inc.,* 485 F.3d at 461–62.  Here, the Suga Defendants do not argue that there is another state where jurisdiction would be proper.  Therefore, the second requirement of Rule 4(k)(2) is also met.

For the third Rule 4(k)(2) requirement that the exercise of jurisdiction comports with due process, as stated previously, the Court's analysis is nearly identical to traditional personal jurisdiction analysis except that the Court considers  Defendants' "contacts with the nation as a whole."  *See id.* at 462 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006)).  Therefore, this Court uses the United States as the relevant forum for the analysis.

To determine whether the Suga Defendants have sufficient "minimum contacts" with the United States to satisfy the requirements of due process, the following three requirements must be met: (1) the Suga Defendants have performed some act or consummated some transaction within the forum or otherwise purposefully availed themselves of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the Suga Defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable.  *Pebble Beach Co.*, 453 F.3d at 1155 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant

of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995) (citation omitted). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger*, 374 F.3d at 802. Once the plaintiff establishes the first two requirements, the burden shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* (quoting *Burger King Corp.*, 471 U.S. at 476–78).

### 1.   Purposeful Direction

Because Plaintiff brings copyright claims, the Court applies the "purposeful direction" test to determine whether the Suga Defendants have "directed [their] actions at the forum state, even if those actions took place elsewhere." *See Pico v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015); *see also Mavrix Photo, Inc.*, 647 F.3d at 1228 (applying purposeful direction test to plaintiff's copyright claims). Courts in the Ninth Circuit rely upon the *Calder* test, which requires a plaintiff to show that the defendant allegedly (1) committed an intentional act, which was (2) expressly aimed at the forum, and (3) caused harm that the defendant knows is likely to be suffered in the forum. *See Pebble Beach Co.*, 453 F.3d at 1156 (applying the test under *Calder v. Jones,* 465 U.S. 783 (1984) to a minimum contacts analysis under Rule 4(k)(2)). The *Calder* test does not require that "the defendant []ever set foot in the forum state," so long as the defendants' contacts had an "effect in the forum." *See Burri Law PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022).

### a)   *Intentional Acts*

Under the first requirement of the *Calder* test, the plaintiff must demonstrate that the defendant committed an "an actual, physical act in the real world." *Schwarzenegger*, 374 F.3d at 806. The Ninth Circuit applies a "relatively low" threshold to the determination of an intentional act. *AirWair Int'l Ltd. v. Schultz*, 73 F. Supp. 3d 1225, 1233 (N.D. Cal. 2014). For instance, courts have found intentional acts can include advertising products outside the forum, *Schwarzenegger*, 374 F.3d at 806; or selling an allegedly infringing

product outside the forum, *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012).

Based on the Court's review of the parties' submissions after Plaintiff conducted jurisdictional discovery, the Court finds that Suga Vietnam is tied to nearly every allegation that the Court previously found constituted an intentional act. For example, the Court previously found that Plaintiff adequately alleged Imba Tech's intentional acts by showing that the Google Play and Apple App stores named Imba Tech as the seller and linked to Imba Tech's website, playiamhero.com, which contained a privacy policy and terms of service that centered on actions within the United States. *See* (Order at 9). Plaintiff now alleges, and Truong also represents, that it was Suga Vietnam that "signed the initial platform agreements with Apple & Google." (Truong Decl. ¶ 12). Additionally, Suga Vietnam—not Imba Tech—is the listed business associated with playiamhero.com, and Truong—not Minh—is the named "[m]anager for [d]omain name" and the "[t]echnical manager." (ECF No. 192-1 at 160–63; Opp. at 13).

Additionally, based on the FAC and documents submitted with Plaintiff's Opposition, the Court finds that Suga Singapore has also engaged in intentional acts. Truong signed the N3twork Contract on behalf of Suga Singapore. *See* (ECF No. 92-1 at 152). Although Minh is identified in his individual capacity as a manager on the signature page of the Imba Network Agreement, his name is also listed on the same page as the CEO of Suga Singapore, who is identified in the Imba Network Agreement as the sole member. (*Id.* at 5, 26). Under the N3twork Contract, Suga Singapore, the named Developer, would remain "solely responsible" for all "hosting and operation of the Game," among other design and development related tasks. (ECF No. 92-1. at 137–38). Further, the "wholly owned affiliate LLC" under the N3twork Contract named Suga Singapore as the initial and sole member. (*Id.* at 26, 136). The N3twork Contract also required Suga Singapore to cooperate directly with sales and distribution tasks, maintain the servers for the Game, and provide "builds" for the game to "enable their commercial release." (*Id.* at 137); *see Blizzard Entm't, Inc. v. Joyfun Inc.*, Case No. SACV 19-1582 JVS (DFMx), 2020 WL

1972284, at *6 (C.D. Cal. Feb. 7, 2020) (finding defendant's "distributing the Infringing Game on platforms such as the Google Play store" and "advertising the Infringing Game via platforms like Facebook" to be intentional acts); *see also Goes Int'l, AB v. Dodur Ltd.*, No. 3:14-cv-05666-LB, 2015 WL 5043296, at *9 (N.D. Cal. Aug. 26, 2015) ("[D]efendants' acts of distributing infringing games to U.S. consumers and generating revenue (and diverting customers from Goes's games) are acts 'expressly aimed' at the U.S."). Finally, Suga Singapore received the funds under the N3twork Contract and would then send that money to Imba Tech. Plaintiff's allegations suffice to show that Suga Singapore committed an intentional act. *See Lisa McConnell, Inc. v. Idearc, Inc.*, No. 09-CV-00061-IEG(AJB), 2010 WL 364172, at *5 (S.D. Cal. Jan. 22, 2010) (finding that the plaintiff's submission of a publishing contract was enough to satisfy the first prong).

The parties dispute whether the rights under the N3twork Contract and Imba Network Agreement were ever transferred to Imba Tech. (Truong Decl. ¶ 12 ("After signing the initial platform agreements with Apple & Google, Suga [Singapore] transfer[ed] all assets in the 'I AM HERO' game over to Defendant Imba Tech.")). Though the Court may not assume the truth of these allegations because they are contradicted by affidavit, the Court still resolves factual conflicts in Plaintiff's favor. *See CollegeSource, Inc.*, 653 F.3d at 1073. The Court accordingly resolves this dispute in Plaintiff's favor and credits its allegation that, contrary to Truong's declaration, he and the Suga Defendants never "sign[ed] any other contract with Imba Network," such as a written agreement that "assigned or delegated any rights or obligations of this [N3twork C]ontract," and there were no amendments to the N3twork Contract. (ECF No. 76-1 at 65). The Court thus finds that Plaintiff has adequately alleged that the Suga Defendants engaged in intentional acts.

### b) *Expressly Aimed at California*

Under the second prong of the *Calder* test, the Court considers whether the relationship between the defendant, the forum, and the litigation arose out of contacts the defendant deliberately created with the forum, and whether the defendant's contacts were

with the forum rather than merely with persons residing in the forum. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143 (9th Cir. 2017) (citing *Walden v. Fiore*, 571 U.S. 277, 291 (2014)).

The Court previously found that Imba Tech's contacts were expressly aimed at the United States.  Those contacts included advertising directly to U.S.-based consumers, promotional campaigns aligning with U.S. holidays, purchasing or leasing U.S. based servers to host the Game, and using its domain to post American-tailored terms of service. (Order at 10).  Based on the jurisdictional discovery, Plaintiff now argues, and the Court agrees, that the Suga Defendants had a "major hand" in most of these activities.  (Opp. at 17).  Specifically, Suga Vietnam heavily funded the Game by providing "many" transfers of funds to help develop the Game, all informally and without any documentation. *See, e.g.*, (ECF No. 76-1 at 50–54; FAC ¶ 15).  Further, Suga Vietnam owns the Game's copyright and is the owner of the domain name that hosted playiamhero.com, with its United States terms of service. *See e.g.,* (ECF No. 92-1 at 155, 160–63).  Taken together, this is sufficient to show that Suga Vietnam expressly aimed its conduct at the United States. *See Wargaming.net Ltd. v. Blitzteam LLC*, Case No.: CV 20-02763-CJC(MRWx), 2021 WL 3619956, at *3 (C.D. Cal. Jan. 20, 2021) (finding expressly aimed conduct by video game developer-defendant because it chose to make its game "available to the United States through Apple's and Google's App stores," "ran advertisements specifically targeted at the United States," and "[the d]efendant's terms of service are the same for all customers except for United States residents."); *cf. Maxim v. Guangzhou NetEase Computer Sys. Co.*, No. 2:20-CV-11331-AB-JC, 2021 WL 4839579, at *6 (C.D. Cal. Aug. 11, 2021) (no personal jurisdiction for owning a website when it made no effort to appeal to customers in the United States and was only available in the Chinese language).

Additionally, Suga Singapore was the only Defendant named in the contracts with Google and Apple sales platforms, the N3twork Contract, and the Imba Network Agreement and was the Defendant that received N3twork's contracted monthly pay outs for the Game. *See* (Truong Decl. ¶¶ 11–12; ECF No. 76-1 at 59–60).  Further, Suga

Singapore agreed under the N3twork Contract to continue to host and operate the Game in exchange for tens of thousands of United States dollars and agreed the terms of the N3twork Contract would be governed by California law.  *See, e.g.*, (ECF No. 76-1 at 66; Opp. at 13; ECF No. 92-1 at 137–38, 151).  The terms of the Contract and Suga Singapore's responsibilities thereunder demonstrate Suga Singapore's conduct was expressly aimed at the forum.  *See Goes Int'l*, 2015 WL 5043296, at *9–10 (finding that "acts of distributing infringing games to U.S. consumers and generating revenue (and diverting consumers from [plaintiff's] games) are acts expressly aimed at the U.S." (quotation marks omitted)).

          *c)*    *Defendants Knew Harm Would Likely Be Suffered In California*

Under the third prong of the *Calder* test, the plaintiff must demonstrate that the defendant's conduct caused harm that it knew was likely to be suffered in the forum.  *Dole Food*, 303 F.3d at 1111 (citations omitted).  "The importance of this requirement is not the magnitude of the harm, but rather its foreseeability." *Entrepreneur Media v. Entrepreneur*, 8:21-cv-00390-JVS-ADS, 2021 U.S. Dist. LEXIS 190868, at *25 (C.D. Cal. July 14, 2021) (citing *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)).  The Ninth Circuit has held that specific jurisdiction exists where a plaintiff files suit in its home state against an out-of-state defendant and alleges that defendant intentionally infringed its intellectual property rights knowing the plaintiff was located in the forum state.  *See Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1321–22 (9th Cir. 1998); *Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284, 288–89 (9th Cir. 1997); *see also Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093, 1105–07 (C.D. Cal. 2007).

Here, the FAC alleges that Defendants knowingly created "knock-off" versions of LoL.  *See, e.g.*, (FAC ¶¶ 6, 46–54).  Further, it alleges that the Suga Defendants engaged in a significant marketing campaign that was designed to reach customers in the United States, including the creation of a dedicated English-language website, playiamhero.com, as well as numerous social media pages, promotional videos, and profiles.  *See* (FAC ¶¶

40–42).   Minh, on behalf of Suga Singapore, negotiated the N3twork Contract and otherwise laid the groundwork for the distribution of the Game in the United States, held himself out as representing Suga Singapore in the transaction, and served as the point of contact for N3twork matters involving the N3twork Contract.  *See* (ECF No. 76-1 at 58–59; Opp. at 13; ECF No. 92-1 at 152).   Further, Suga Singapore is the entity who signed the Google and Apple store contracts.  *See, e.g.*, (ECF No. 92-1 at 26; Truong Decl. ¶¶ 11–12).   Suga Vietnam heavily funded the development of the Game and registered and owns the domain that hosted playiamhero.com, with its United States terms of service.   As the Court previously found, the combination of this evidence, along with the fact that Plaintiff is a well-known videogame developer of LoL based in the United States, demonstrate that the Suga Defendants knew that harm was likely to be suffered in the United States. *See, e.g., Blizzard Entm't, Inc. v. Bossland GmbH*, Case No. SA CV 16-1236-DOC (KESx), 2017 WL 412262, at *4 ("Bossland had to anticipate that Blizzard, a company well known to be based in the United States, would suffer loss in the United States as a result of Bossland's software."); *3DO Co. v. Poptop Software, Inc.*, No. C-98-4023 SC., 1998 WL 962202, at *4 (N.D. Cal. Oct. 27, 1998) (finding foreseeable harm because "[t]he computer game industry is primarily located in California.   Therefore, Defendants' conduct is likely to have an effect in the forum state."); *Wargaming.net Lmtd.*, 2021 WL 3619956, at *4 ("Because hundreds of thousands of United States' consumers play Plaintiff's games, it was foreseeable that Defendant's infringement would cause Plaintiff to suffer" harm in the forum).   Accordingly, Plaintiff has satisfied each of the three prongs of the *Calder* test as to the Suga Defendants.

### d)      Alter Ego Theory

Even if each Suga Defendant's contacts with the forum were not sufficient under *Calder* for the Court to exercise personal jurisdiction, based on the Complaint's allegations and the parties' submissions, Plaintiff has demonstrated for purposes of the Motion that the named Defendants are alter egos of each other such that exercise of personal jurisdiction over the Suga Defendants is appropriate.

An alter ego test can extend personal jurisdiction to a "foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate." *Ranza v. Nike, Inc.,* 793 F.3d 1059, 1073 (9th Cir. 2015).  To apply this test, the plaintiff must make a prima facie case that "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Id.* (citation omitted) (alterations in original).  The first prong requires a showing that the foreign entity controls the other "to such a degree as to render the latter the mere instrumentality of the former." *Id.*  However, the foreign entity directly owning the subsidiary is neither a necessary nor sufficient requirement for this prong.  *See id.*; *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1150 (S.D. Cal. 2018).  If there is "some nexus of control" between the entities that demonstrates that the first "controls the [second] to such a degree as to render the latter a mere instrumentality of the former," the court can still consider whether the entities have such unity of interest that "the separate personalities [of the two entities] no longer exist."  *Ranza*, 793 F.3d at 1073; *see Packaged Seafood*, 338 F. Supp. 3d at 1150–51.  To determine whether a sufficient showing has been made, courts examine "all the circumstances" regarding unity of interest, including factors such as "inadequate capitalization, commingling of funds and other assets of the two entities, . . . use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, [and] lack of segregation of corporate records."  *Vizio, Inc. v. LeEco V. LTD.*, No. SA CV 17-1175-DOC (JPRx), 2018 WL 5303078, at *18 (C.D. Cal. July 27, 2018) (quoting *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002).  No single factor is determinative.  *Id.*

Here, Plaintiff argues and the Court agrees for purposes of the Motion that there is such a unity of interest and ownership, commingling of funds, and disregard for corporate formalities between the named Defendants such that their separate personalities no longer exist.  *See* (Opp. at 19–23; FAC ¶ 2); *Ranza*, 793 F.3d at 1073.  From the Court's review of the parties' submissions, there is a lack of clarity regarding the exact nature of the

corporate relationship between the four companies caused by the Defendants complete disregard of corporate formalities. *See* (ECF No. 76-1 at 44 ("We do not need some kind of document to determine who would be the real shareholder, how many percent, each person [sic].")); *Vizio*, 2018 WL 5303078, at *18 (finding "disregard of corporate formalities" relevant for alter-ego jurisdiction).   Indeed, Plaintiff's argument and supporting allegations that "[t]here are no corporate records, let alone separate ones, corresponding to inter-entity transactions," *see* (Opp. at 22 (emphasis removed); FAC ¶¶ 3, 5, 14, 15, 32), is demonstrated by the evidence submitted by the parties.  For instance, according to Truong's deposition testimony, he believed his cash transfers from Suga Vietnam to Imba Tech benefited all of the companies: essentially, it was "put[ting] the money in [Suga Vietnam] with benefit [to] everyone." (ECF No. 76-1 at 52).  Truong further testified that Suga Singapore has a bank account, but no employees, because "it [is] just a representative for SUGA [Singapore] in Singapore to run its operation in Vietnam." (*Id.* at 19).  Because Truong "did not really pay attention if the right belonged to SUGA or Imba," Suga Vietnam, not Imba Tech, appears to own the copyright to the Game. (*Id.* at 60–62).  Additionally, Suga Singapore is the sole member of Imba Network and was the represented entity during all the N3twork Contract negotiations regarding the Game.  While Truong represents in his declaration that all the rights to the Game were transferred to Defendants Imba Tech and Imba Network after the Suga Defendants signed the various distribution contracts, Defendants have not provided any records to confirm that representation and Truong's deposition testimony indicates such records do not exist. (Truong Decl. ¶ 12; ECF No. 76-1 at 65).

The record is also replete with examples showing that the Defendants commingle their funds.  Truong represents in his declaration that the Suga Defendants each maintain their own bank accounts and do not share the accounts with any other entity. *See* (Truong Decl. ¶ 7).  However, Truong testified during his deposition that Defendant Imba Tech does not own a bank account and relies entirely on Suga Singapore's bank account to receive money from N3twork for the Game proceeds under the N3twork Contract. *See*

-19-

(ECF No. 76-1 at 69–70). Further, Truong testified that Defendant Suga Singapore received $20,000 to $25,000 a month from N3twork as Game proceeds and, because Imba Tech did not have a direct account, it was faster and easier to transfer the money to Suga Vietnam for Imba Tech or for Truong to use his money to make the transfer to Imba Tech. (*Id.* at 66–70). Additionally, if Imba Tech needed to pay clients in other countries and was unable to pay them, Defendant Suga Singapore would pay Imba Tech's clients. (*Id.* at 70). Truong and Suga Vietnam also provided significant funding to Imba Tech (which Truong and Suga Vietnam knew was used to develop the Game). (*Id.* at 50–54). Truong and Suga Vietnam provided money "many times" to Imba Tech: "when Imba need[s] money, I would provide the money." (*Id.* at 54). Not one of those "many" transactions was memorialized in any type of record—written or otherwise. *See* (*id.* at 48–50); *RAE Systems, Inc. v. TSA Systems, Ltd.*, No. C 04-2030 FMS., 2005 WL 1513124, at *3–4 (N.D. Cal. June 24, 2005) (applying alter ego theory when, among other acts, the parent company funded the subsidiary); *Vizio*, 2018 WL 5303078, at *18 (noting that guaranteeing a "$50 million termination fee" for the subsidiary "without any consideration" demonstrated a "commingling of funds and a disregard of corporate formalities between the two companies"). Imba Tech's lack of a bank account and Suga Singapore's reported losses illustrate that the entities are also undercapitalized, which is "highly probative of an alleged alter ego relationship." *See* (Opp. at 17); *Whatru Holding, LLC v. Bouncing Angels, Inc.*, No. CV 14–05187 BRO (PLAx), 2015 WL 12861157, at *4 (C.D. Cal. July 14, 2015). Thus, Plaintiff has satisfied the first prong of the alter ego test.

As to the second prong, the court considers whether failure to disregard the corporation would result in injustice. *See RAE Systems*, 2005 WL 1513124, at *3; *Packaged Seafood*, 338 F. Supp. 3d at 1167 ("[I]t would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity." (alteration in original)). Here, Plaintiff argues that, if the Court respects the "so-called corporate separation between these companies," it would be endorsing the "fraud that

Defendants have repeatedly perpetuated . . . [in] obscur[ing] the actual ownership of themselves and the Game." (Opp. at 23). Because the proceeds from the game "make their way" to both the Suga Defendants and Imba Tech, Plaintiff argues all should be held to account in this Court.

The Court agrees that respecting the Defendants' purported corporate separateness would result in injustice. Suga Singapore is the entity that received the tens of thousands of U.S. dollars from the Game and apparently holds the contractual rights to the Game with respect to N3twork, while Suga Vietnam provided substantial funding for the Game and owns its copyright. *See Vizio*, 2018 WL 5303078, at *19 ("[I]t would be unjust to allow the parent company to escape liability when it was a key player in enabling the alleged fraud of the subsidiary company."). Further, as the FAC alleges, the Suga Defendants engaged in a significant marketing campaign that was designed to reach customers in the United States, including the creation of a dedicated English-language website, playiamhero.com, as well as numerous social media pages, promotional videos, and profiles. *See* (FAC ¶¶ 40–42). Thus, Plaintiff has made a prima facie case for treating the Defendants as alter egos of each other, and Imba Tech's actions can also be imputed to the Suga Defendants for purposes of determining personal jurisdiction.

## 2.   Arises Out of Forum Activities

Next, the Court determines if Plaintiff would not have suffered a copyright injury "but for" the Suga Defendant's conduct directed towards the United States. *See Panavision Int'l, L.P.*, 141 F.3d at 1322 (citation omitted). The Court previously found Imba Tech's conduct to be a but-for cause of Plaintiff's claims. *See* (Order at 13). The same is true for the Suga Defendants. Specifically, American consumers would not have downloaded and played the Game but for the Suga Defendants previously discussed roles in developing, marketing, and distributing the allegedly infringing game. *See Joyfun Inc.*, 2020 WL 1972284, at *7 (finding the defendant's conduct to be a but-for cause because "players in the U.S. would not have downloaded and played the Infringing Game but for [defendant's]

-21-

1 role in the distribution and marketing of the Infringing Game to users within the United

2 States"). Therefore, the Court finds that Plaintiff's copyright claim arises out of or results

3 from the Suga Defendants' forum-related activities.

### 3. Reasonableness of Jurisdiction

5 After the plaintiff satisfies the first two jurisdictional requirements, "the burden then

6 shifts to the defendant to 'present a compelling case' that the exercise of specific

7 jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger*

8 *King Corp.*, 471 U.S. at 476–78). The Court considers seven factors when assessing

9 reasonableness: "(1) the extent of a defendant's purposeful interjection; (2) the burden on

10 the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of

11 the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most

12 efficient judicial resolution of the controversy; (6) the importance of the forum to the

13 plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative

14 forum." *Panavision Int'l, L.P.*, 141 F.3d at 1323 (citation omitted). "No one factor is

15 dispositive; a court must balance all seven." *Id.* (citing *Core–Vent Corp. v. Nobel Indus.*

16 *AB*, 11 F.3d 1482, 1488 (9th Cir. 1993)). For the reasons that follow, the Court agrees with

17 Plaintiff that the Suga Defendants have not carried their burden in showing that jurisdiction

18 would be unreasonable.

### a) First Factor: Extent of Defendants' Purposeful Injection

21 "Even if there is sufficient 'interjection' into the [forum] to satisfy the purposeful

22 availment prong, the degree of interjection is a factor to be weighed in assessing the overall

23 reasonableness of jurisdiction under the reasonableness prong." *Core–Vent Corp. v. Nobel*

24 *Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993) (quoting *Ins. Co. of N. Am. v. Marina Salina*

25 *Cruz*, 649 F.2d 1266, 1271 (9th Cir. 1981)). The Court previously rejected Imba Tech's

26 contentions that it did not inject itself into California at all. *See* (Order at 14). The Suga

27 Defendants rely on the same argument that there "are no allegations or facts from which

28 one could infer that the Suga Entities ever 'injected' itself into California at all." (Mot. at

22).  However, for the reasons already discussed, the record demonstrates that the Suga Defendants played a critical role in developing the Game, own the Game's copyright, manage and own the domain that hosts the Game, own the contractual rights under the distribution agreement, and receive all the advances for the Game under the N3twork Contract.  Thus, this factor favors jurisdiction.  *See, e.g., Joyfun Inc.*, 2020 WL 1972284, at *12 (finding first factor favoring jurisdiction because "[t]he Court has already found that Joyfun purposefully injected itself in the forum via its various forms of support for the operation and monetization of the Infringing Game.").

> b) *Second factor: Burden on Defendant in Defending in the Forum*

For the second factor, "[u]nless [the] inconvenience is so great as to constitute a deprivation of due process," the defendant's burden of defending itself in the forum will "not overcome clear justifications for the exercise of jurisdiction."  *See Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991) (citation omitted).

Here, the Suga Defendants argue they would be burdened by having to defend in the forum because their "witnesses and representatives are not English speakers" and having testimony and documents translated would result in significant additional costs and likely add to the duration and complexity of litigating the case in the United States.  (Mot. at 33).  The Court recognizes the Suga Defendants will experience some added burden by having to litigate this case within the United States, yet finds this fact is not dispositive.  As the Ninth Circuit has recognized, "[m]odern advances in communications and transportation have significantly reduced the burden of litigating in another country."  *Dole Foods Co. v. Watts*, 303 F.3d 1104, 1115 (9th Cir. 2002) (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988)). Therefore, this factor only slightly disfavors jurisdiction.

> c) *Third and Fourth Factors: Balancing the Forum's State Interest with the Extent of Conflict with the Sovereignty of the Defendant's State*

The Defendants contend that the third and fourth factors weigh against reasonableness only on the purported basis that "California has little interest in litigating a dispute with foreign corporations located in Singapore and Vietnam." (Mot. at 22).

It is true that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co.*, 480 U.S. at 115 (internal quotations omitted). However, the United States has a "significant interest in resolving disputes of United States copyright law involving infringement by foreign defendants." *AMA Multimedia LLC v. Sagan Ltd.*, No. CV-16-01269-PHX-DGC, 2016 WL 5946051, at *7 (D. Ariz. Oct. 13, 2016); *see also Dish Network, LLC v. Jadoo TV, Inc.*, No. CV 18-9768 FMO (KSx), 2020 U.S. Dist. LEXIS 209819, at *30 (C.D. Cal. Mar. 16, 2020) ("The United States has an interest in the enforcement of its copyright laws." (citing *Microsoft Corp. v. Very Competitive Comput. Prods. Corp.*, 671 F. Supp. 1250, 1256 (N.D. Cal. 1987))). Additionally, the Suga Defendants' allegations do not explain why the exercise of jurisdiction by a United States court would impinge upon the sovereignty of Vietnam or Singapore in a case involving American Copyright law. *See* (Mot. 22). The Court thus finds that the third and fourth factors favor jurisdiction.

> d) *Fifth Factor: The Most Efficient Judicial Resolution of the Controversy*

The fifth factor "focuses on the location of the evidence and witnesses." *Panavision*, 141 F.3d at 1323 (citation omitted). The Suga Defendants contend that this factor weighs against jurisdiction because witnesses and evidence relating to the Defendants are likely to be located in Vietnam or Singapore. (Mot. at 23); *see Dish Network, LLC*, 2020 U.S. Dist. LEXIS 209819, at *30 (citing *Panavision Int'l*, 141 F.3d at 1323). However, the Suga Defendants have not identified any such witnesses or evidence. The Court also notes that evidence of alleged infringement, as well marketing and distribution, is likely located within the United States. As such, based on the facts and circumstances of the case, the Court finds that this factor is either neutral or only slightly disfavors exercise of personal jurisdiction.

1

2          *e)*    *Sixth Factor: Importance of the Forum to the Plaintiff's Interest*

3                   *in Convenient and Effective Relief*

4       Plaintiff has an interest in seeking relief in its home forum.  *See CE Distrib., LLC v.*

5 *New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004) ("Litigating in one's home forum

6 is obviously most convenient.").  At the same time, Plaintiff is a global corporation and

7 this factor is generally not given much weight in the overall analysis. *See Dole Foods Co.*,

8 303 F.3d at 1116 (citation omitted).  For this reason, this factor weighs only slightly in

9 favor of jurisdiction.

10

11          *f)*    *Seventh: Unavailability of an Alternative Forum*

12      Plaintiff bears the burden of proving the unavailability of an alternative forum and,

13 similar to its prior Opposition, has made no such showing.  *Harris Rutsky & Co. Ins.*

14 *Services, Inc. v. Bell & Clements, Ltd*., 328 F.3d 1122, 1133–34 (9th Cir. 2003).  Therefore,

15 this factor disfavors the exercise of specific jurisdiction.

16      In sum, the Suga Defendants have only shown that three of the seven prongs disfavor

17 the exercise of specific jurisdiction.  Under the circumstances, the Court finds that the Suga

18 Defendants have failed to present a "compelling case" for why this Court should not

19 exercise specific jurisdiction over the matter. *See Dole Foods,* 303 F.3d at 1117 (collecting

20 cases).  As a result, the Court also finds that Plaintiff has raised a prima facie showing and

21 therefore, the Court may exercise specific jurisdiction over the Suga Defendants under the

22 federal long-arm statute and by way of alter-ego liability.  The motion to dismiss, insofar

23 as it is based on lack of personal jurisdiction, is therefore denied on that ground.

24

25   **B.**    **Forum Non Conveniens**

26      The Suga Defendants alternatively ask the Court to dismiss the case based on *forum*

27 *non conveniens* to allow the dispute to be resolved in Singapore or Vietnam.  (Mot. at 30–

28 35).  When a party moves to dismiss based on *forum non conveniens*, it must show "(1) the

existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal." *Lockman Found.*, 930 F.2d at 767 (citing *Contact Lumber Co.*, 918 F.2d at 1448–49). A plaintiff's choice of forum will not be disturbed unless the private interest and public interest factors "strongly favor trial in a foreign country." *CYBERsitter*, 805 F. Supp. 2d at 965 (quoting *Lueck*, 236 F.3d at 1145). The defendant must make a "clear showing of facts which establish[es] such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience." *Bos. Telecomm. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (citation omitted). Accordingly, dismissal under a *forum non conveniens* theory is appropriate "where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248–249 (1981).

### 1.   Adequate Alternative Forum

Because *forum non conveniens* results in the dismissal of the plaintiff's case, the defendant must demonstrate that there is an adequate alternative forum, showing that (1) all defendants are amenable to jurisdiction in the forum, and (2) that the forum "provides the plaintiff with a sufficient remedy for his wrong." *Dole Food*, 303 F.3d at 1118; *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F. Supp. 2d 1073, 1095 (C.D. Cal. 2003) ("Key in this analysis is the availability of an alternative forum where *all* defendants are amenable to personal jurisdiction." (emphasis in original)).

The Suga Defendants have not satisfied the threshold showing that an alternative forum exists. The Suga Defendants have only discussed their amenability to jurisdiction in Singapore or Vietnam and have failed to address whether Imba Tech or Imba Network would accept service to appear in these jurisdictions. (Mot. at 31; Opp. at 26; Reply at 10); *see Grokster*, 243 F. Supp. 2d at 1095 (*forum non conveniens* inappropriate because "[Defendant] has made no showing that its non-Australian co-Defendants are amenable to suit in Australia or Vanuatu."); *Dole Food Co.,* 303 F.3d at 1118 ("A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." (quoting *Alpine View Co. Ltd. v. Atlas Copco*, 205 F.3d 208, 221 (5th Cir.2000)

(emphasis altered)); *Wright v. Old Gringo Inc*., No. 17-CV-1996-BAS-MSB, 2019 WL 2436779, at *6 (S.D. Cal. June 11, 2019) ("Where there are multiple defendants, an adequate forum will only exist if all defendants are shown to be amenable to process." (quoting *Flack v. Nutribullet, L.L.C.*, No. 2:18-CV-05829-DDP (SSX), 2018 WL 6330421, at *2 (C.D. Cal. Dec. 4, 2018)); *see also DIRTT Env't Sols., Inc. v. Falkbuilt Ltd*., 65 F.4th 547, 555 (10th Cir. 2023) ("We therefore foreclose this possibility by expressly holding that forum non conveniens is not available as a tool to split or bifurcate cases."). Dismissing only the Suga Defendants to pursue their case in Singapore, while the Imba Defendants continue in this Court, would result in the great inconvenience to Plaintiff, which would override the premise of *forum non conveniens* in promoting the efficiency of judicial administration and deferring to the plaintiff's choice of home forum.  *See Bos. Telecomm. Grp.*, 588 F.3d at 1207.  Given the gravity of the result of *forum non conveniens*, the Suga Defendants' partial showing is not enough to demonstrate that Singapore (or Vietnam) is an alternative forum.  *See Dole Food Co*., 303 F.3d at 1118 (declining to uphold a dismissal based on *forum non conveniens*, in part, because the record was unclear as to the alternative adequate forum).  Accordingly, the Suga Defendants have not made a threshold showing that there is an adequate alternative forum.  *See Campbell v. Oviedo*, No. 11cv10–BTM (NLS), 2011 WL 4024509, at *4 (S.D. Cal. Sept. 9, 2011); *DIRTT Env't Sols.*, 65 F.4th at 555.

The Suga Defendants also have not sufficiently demonstrated that the public and private interest factors "strongly favor" trial in a foreign country. *CYBERsitter*, 805 F. Supp. 2d at 965.  The private interest factors consider the "practical problems" that come along with making a trial "easy, expeditious and inexpensive," *id.*, such as the "ease of access to sources of proof; compulsory process to obtain the attendance of hostile witnesses, and the cost of transporting friendly witnesses; and other problems that interfere with an expeditious trial." *Lockman Found*., 930 F.2d at 769 (citations omitted).  The Suga Defendants only raise the ease of access to proof and witnesses. *See* (Mot. at 32).  It is true that if sufficiently shown, the location of evidence and witnesses in a foreign country could

weigh in favor of dismissal. *See In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d 1176, 1198 (C.D. Cal. 2004) (dismissing case based on *forum non conveniens* because the plane crash occurred in Taiwanese waters, most of the plaintiffs were not American plaintiffs, and the vast majority of the decedents were Taiwanese, with their surviving families in Taiwan). However, the Suga Defendants only broadly claim that "all of the Suga Entities' representatives and witnesses are located in Singapore and Vietnam," (Mot. at 32), and do not "identif[y] potentially unavailable witnesses with adequate specificity." *In re Air Crash Over Taiwan Straits*, 331 F. Supp. 2d at 1197–98.

The Suga Defendants similarly fail to show that the public interest factors would strongly favor dismissal. The public interest factors consider the local public's interest in resolving the dispute and the cost and burden to the local courts. *CYBERsitter*, 805 F. Supp. 2d at 965; *Lockman Found.*, 930 F.2d at 771 ("Public interest factors encompass court congestion, the local interest in resolving the controversy, and the preference for having a forum apply a law with which it is familiar."). The Suga Defendants contend that California has a "minimal, at best" interest in adjudicating this case because the Suga Defendants "do not conduct business in the United States, including California," (Mot. at 32), but the Court has already found that the Suga Defendants have sufficient contacts with California. *See e.g., Dole Foods*, 303 F.3d at 1119 ("California has an interest in protecting corporations based in California."); *Dish Network*, 2020 U.S. Dist. LEXIS 209819, at *30 ("The United States has an interest in the enforcement of its copyright laws." (citation omitted)).

The Suga Defendants also argue that this Court would be burdened by adjudicating this case because the Central District of California is a busy district and because the Suga Defendant witnesses would require translators. (Mot. at 33). The Suga Defendants offer no evidence demonstrating that the courts in Singapore or Vietnam would be less busy or more expeditious than this District. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984) (reversing *forum non conveniens* dismissal when it "observed only that its docket was congested[] [and] did not determine whether a trial would be speedier

in the Philippines," and finding it "unfair for a court to subject a United States corporation to the courts of another country merely because plaintiff's home country courts are congested"). Additionally, it is just as likely that "translation of documents and testimony will be required whichever forum is selected." *In re Air Crash Over Taiwan Straits*, 331 F. Supp. 2d at 1200; *CYBERsitter*, 805 F. Supp. 2d 958, 966 (C.D. Cal. 2011) (noting that if translation costs were "sufficient to dismiss a case for *forum non conveniens*, American plaintiffs rarely would have the opportunity to prosecute claims against foreign defendants in American courts.").

In sum, the Suga Defendants' arguments that they "would obviously prefer to litigate in either Singapore or Vietnam," (Mot. at 32), are not enough to make a "clear showing which establish[es] such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience." *Bos. Telecomm. Grp.*, 588 F.3d at 1206.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** the Suga Defendants' Motion to Dismiss.


IT IS SO ORDERED.


DATED:  September 14, 2023

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE